STATE of Missouri, Respondent,

v.

Kim Eugene PHILLIPS, Appellant.

No. 59379.

Supreme Court of Missouri,
En Banc.

March 13, 1978.

Rehearing Denied April 10, 1978.

Adam B. Fischer, Durley, Keating & Fischer, Sedalia, for appellant.

John D. Ashcroft, Atty. Gen., Paul R. Otto, Neil MacFarlane, Asst. Attys. Gen., Jefferson City, for respondent.

HENLEY, Judge.

Kim Eugene Phillips (defendant), charged with and convicted of second degree murder, was sentenced in accordance with a jury verdict to 50 years in the custody of the Department of Corrections. On appeal to the Court of Appeals, Kansas City District, the judgment was reversed for error in admitting in evidence a written statement given by defendant to police officers, and the case was remanded for a new trial. We ordered the case transferred to this court on application of the State. We affirm.

The body of Karen Jones was found in her Sedalia apartment August 13, 1973. Her death was caused by strangulation.

Defendant, a 21 year old former Air Force enlistee, was among acquaintances of the dead woman questioned by police regarding their whereabouts the evening before discovery of the body. Defendant was a native of the state of California and graduated from Pacifica, California high school in 1970. He had been stationed at Whiteman Air Force Base, but was living in Sedalia at the time of the crime. He went to police headquarters of his own volition on the morning of August 15, 1973, where he was questioned by James Donley, a deputy sheriff. As a result of this questioning he agreed to take a polygraph test administered the next day (August 16) at Troop A headquarters of the State Highway Patrol in Lee's Summit. The test was given by Merlin Buesing, a member of the State Highway Patrol. During a discussion of the test results defendant's response to a question tended to incriminate him. Deputy Donley, who had driven defendant to Lee's Summit that morning, observed the polygraph test and heard this discussion from an adjoining room. Later that day, between 6:30 and 7:00 p. m., at the Pettis county courthouse in Sedalia, defendant, in response to questions by Emmett Fairfax, Sheriff of Pettis county, made a statement confessing that he killed Karen Jones. This statement was reduced to writing, signed by defendant, and witnessed by Sheriff Fairfax and Patrolman Buesing.

Defendant moved to suppress all evidence of oral and written statements made by him to or within the hearing of the police officers regarding the killing of Karen Jones on the ground they were not made voluntarily, because he was not fully advised of or ac-

corded rights guaranteed him by the federal and state constitutions[1] in that (1) he invoked but was denied the rights to remain silent and to have counsel present during his interrogation by police; (2) he was misled and tricked into making an incriminating statement by erroneous advice given him by Patrolman Buesing.

Two-thirds of the approximately 300 page transcript of the record is made up of evidence presented at the pretrial hearing of the motion. The motion to suppress was overruled. At a trial before a jury his oral admission to Patrolman Buesing at Lee's Summit and his written confession were admitted in evidence over his objections.

James Donley, a deputy sheriff of Lafayette county and a member of the Metro Squad with headquarters at the courthouse in Sedalia, testified that defendant came to the Pettis county courthouse during the morning of August 15, 1973, to talk to someone regarding the Karen Jones homicide; that he was assigned to interview defendant and they went to a room adjacent to the courtroom for that purpose; that before interviewing defendant he "warned him of his rights" by reading to him from a card containing the Miranda warnings; that after informing defendant of his rights, he asked him whether he understood those rights and defendant replied that he did; that he also asked whether he wished "to talk to us now" and defendant said "he wanted to tell us or help us on the case if he could"; that he listened to what defendant had to say and at the end of the interview they agreed that defendant would take a polygraph test the next morning in Lee's Summit; that defendant returned to the courthouse the next morning and they left for Lee's Summit in the Deputy's patrol car; that they did not discuss the Jones homicide case enroute.

Deputy Donley further testified that on arrival at Patrol Headquarters he introduced defendant to Corporal Merlin Buesing; that defendant and Corporal Buesing went into the polygraph room; that he went into an adjoining room from which he could see and hear the polygraph test without being seen or heard; that Corporal Buesing had a printed "waiver" form which had been prepared for the signature of a person who voluntarily submitted to a polygraph test; that the Miranda "rights" were printed on this form; that Corporal Buesing read and explained the rights to defendant; that defendant said he understood his rights and signed the waiver; that Corporal Buesing explained to defendant how the polygraph machine worked and then began the test; that near the end of the test, defendant said to Corporal Buesing that "he [Buesing] didn't have to look any farther, he had his man * * *"; that defendant said essentially the same thing to him (Donley) just before they stopped at a restaurant in Lee's Summit enroute back to Sedalia late that afternoon.

Corporal Buesing testified that he and defendant read together and discussed the waiver form and defendant's "rights," as defined by Miranda, before the polygraph test was given; that he explained and they also discussed the polygraph procedure; that during their discussion he placed the waiver form in front of defendant for his signature; that defendant said "he didn't know whether he should have an attorney or not"; that he (Buesing) "told him that this, he would have to decide before we went ahead"; that defendant then signed the waiver form, dated it, and wrote the hour of 11:30 or 11:45 a. m. next to the date, indicating and saying that he wanted to go ahead with the test; that he then gave defendant the polygraph test, which took about an hour or an hour and a half; that after the polygraph test was completed he (defendant) indicated to me that there was more he could tell me about the case, so "I asked him directly if we should be looking for other persons * * * and he indicated that we should not"; that at this

1. He refers to the Fifth, Sixth and Fourteenth Amendments to the United States Constitution as interpreted in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and to Mo.Const. Art. I, § 10.

point defendant mentioned that "he didn't know if he should talk to an attorney or not"; that he reminded defendant that this was one of his rights and it was for him to decide whether he should; that defendant "thought a little bit and then we went ahead with our discussion"; that defendant did not at any time ask to see an attorney; that his attitude as to whether he wanted an attorney present was: "I don't know," I am "considering" the question.

Corporal Buesing further testified that at some time during the day, possibly near the end of their discussions, defendant mentioned that he had a friend in Sedalia named Greg Woods, who knew some good lawyers, and that "he might want to talk to ·Greg Woods about talking to a lawyer"; that defendant asked him to make arrangements for him to talk to Greg Woods; that he talked to someone (not the sheriff) at the Metro Squad headquarters and told that person that defendant had "indicated we didn't * * * need to look for another person involved in this thing"; that he also told this person that defendant had said he might want to talk to Greg Woods and had indicated he "might want to talk to a lawyer"; that he asked that the Metro Squad have Greg Woods available, if possible, at Squad headquarters when they (Deputy Donley, defendant, and Corporal Buesing) returned to Sedalia that evening.

Sheriff Fairfax testified that during the afternoon of August 16 he received information through the Metro Squad that defendant, Corporal Buesing and Deputy Donley were enroute to Sedalia and that defendant "may want to talk to a lawyer"; that there was no mention to him that day by anyone, including defendant, that defendant wanted to talk to a Greg Woods; that he met defendant in a jury room of the Pettis county courthouse sometime between 6:30 and 7:00 p.m. on August 16, 1973; that he took a statement from defendant after first informing him of his *Miranda* rights by reading them from a card; that after explaining these rights to defendant he asked him whether he understood his rights; that defendant responded that he did; that after defendant said he under-

stood, he (the sheriff) asked him whether he wished to talk to us now.

· Defendant's response to this question, according to the sheriff, and the next two questions and answers were as follows:

"A. He responded . . . . . he said he didn't know whether he should talk to us at this time with . . . . . without before he . . . . . or without talking to a lawyer, some words to that affect. He said he didn't know whether he should talk to us without talking to a lawyer.

"Q. What did you tell him, if anything, at that time?

"A. I told him that that was his right that he could have counsel, he could talk to a lawyer at any time that he desired and that further that he could also waive that right if he desired to talk to us about the Karen Jones murder.

"Q. What did he do at that time?

"A. Well he said he guessed that he would, and went on to talk to us about the afternoon of August the 12th and 13th of 1973 and about Karen Jones."

Sheriff Fairfax further testified that as defendant talked of what occurred at Karen Jones' apartment on August 12 and 13 and how he killed her, he (the sheriff) typed in narrative form the two-page statement which was admitted in evidence; that after the statement was finished, he went over it with defendant; that defendant made corrections by striking through words and initialing the parts he had stricken; that defendant then signed the statement in the presence of Corporal Buesing and him.

Sheriff Fairfax also testified that he got in touch with the prosecuting attorney that afternoon and told him that defendant "may" want to talk to a lawyer, not that defendant had "requested" a lawyer.

Gary W. Fleming, prosecuting attorney of Pettis county, testified that the sheriff talked with him the afternoon of August 16 about arranging to have an attorney available " * * * should Kim Phillips want to talk to one"; that he contacted the county magistrate by telephone regarding the ap-

pointment of an attorney should defendant "want to talk to an attorney"; that the magistrate told him Adam Fischer was the attorney next on the list for appointment and that he (the prosecuting attorney) should contact Mr. Fischer direct and tell him that he was to consider himself appointed should it develop that defendant wanted to talk to an attorney; that he (the prosecuting attorney) contacted Mr. Fischer later in the day and determined where he could be reached that evening if he were needed, but he had no occasion to call Mr. Fischer that evening.

The defendant testified that he did not tell Corporal Buesing that "[he] didn't know whether [he] should talk to an attorney," that his exact words were: "I would rather talk to an attorney before answering any questions"; that he told Corporal Buesing this before he signed the waiver form and consented to take the polygraph test; that he talked to Corporal Buesing about Greg Woods "just before [he] signed the [waiver and consent form] * * *, when he [Buesing] asked me if I understood my rights [and] I told him yes and that I would rather speak to a lawyer before answering any more * * * or any questions"; that he did not mention Greg Woods again in Lee's Summit after he signed the waiver and consent form that morning; that Corporal Buesing told him that afternoon that he had been in touch with the Metro Squad and had asked that Greg Woods be contacted and that he (Woods) "would probably be at the courthouse when we" returned to Sedalia.

Defendant further testified that after the polygraph test had been completed Corporal Buesing told him "that what [he] had answered had not corresponded to what the polygraph showed"; that his response to this was: "Well I . . . . . I didn't say much of anything, shrugged, lifted my shoulders in acknowledgment and in question and he went on to ask me that . . . . . if . . . . . if I knew who had killed Karen Jones and I told him no and this was after the test was . . . . . was . . . . . well had dis . . . . . turned off the thing and disconnected the wiring from me. He asked me if I knew who killed her

and I told him no I didn't and then he asked me . . . . . he told me that according to what we have here you're not telling me the truth and I says, well I'm . . . . . I'm telling you what I know and he says well we can make things a lot simpler if . . . . . if you come right out and tell me. He told me that it wouldn't go against you in any way and that it wouldn't be used against you in court * * *"; that Corporal Buesing also told him, just before he told the corporal that he did not need to look any further for anybody, that "what I [had] told him couldn't be used because it would be unconstitutional to convict a person on * * * the basis of a confession."

Defendant further testified that they arrived at Sedalia at about 6:15 p.m. from Lee's Summit; that Greg Woods was not there when they arrived; that he did not talk to Greg Woods that evening; that he told Sheriff Fairfax, in response to the sheriff's reading to him his rights from a *Miranda* card, that he understood his rights and that he "would rather see an attorney before [he] answered any questions"; that he did *not* tell the sheriff that "[I] didn't know whether [I] should talk to a lawyer"; that at this point the sheriff left the room and returned with a typewriter; that he then gave the sheriff a statement which the sheriff typed on two sheets of paper; that the sheriff went over the statement with him; that he did not read the statement, but it was read to him and "as we got to the mistakes I corrected them, lined them out and put my initials [where each correction was made]"; that he was reluctant to sign the statement and did not do so until "I told him [the sheriff] that I would rather see an attorney before signing it"; that he signed the statement and the sheriff and Corporal Buesing witnessed his signature; that there was "not any one of those rights * * * that [he] didn't understand," and that he "didn't have any question about any of them."

In connection with defendant's testimony that Corporal Buesing had told him that "it would be unconstitutional to convict a person on the basis of a confession," Corporal

Buesing testified, on cross-examination, that he was "aware of" but "not familiar with" the "legal concept" that "a defendant cannot be convicted on the basis of an out of court statement alone unless a corpus delicti is established"; that "this was mentioned" during the discussions before defendant "indicated [we] didn't have to look any further"; that he does not "recall exactly" what was said by him or defendant, but the "basic context" of what he said to defendant was: "that the Metro Squad was developing evidence in the case which was pointing more and more to him and that this evidence would be necessary in making a case against him * * * [that] there must be something besides his own admission." He further testified, on cross-examination that both he (Buesing) and the sheriff told defendant "that he was going to have to decide" when defendant said, immediately after the sheriff read defendant's rights to him, "that he didn't know if he should talk to * * * a lawyer"; that he (Buesing) also asked him: "do you want a lawyer?" and he (defendant) "didn't say he wanted one" and he did not say "he did not want one * * * he just indicated let's go ahead."

As stated, the motion to suppress was overruled, the court having found that defendant was fully advised of his rights under *Miranda,* that he freely, intelligently and voluntarily waived those rights, and that the oral and written statements made were voluntary and admissible in evidence. There is no claim here that either one of the statements was the product of coercion, threats, fear or promise of leniency.

Defendant's points on appeal are that the court erred in overruling his motion to suppress and in admitting at the trial, over his objection, all evidence of (1) his oral incriminating statement to Corporal Buesing in Lee's Summit; and (2) his written state-

ment made to the sheriff in Sedalia and oral statements elicited from him in the process of preparation of the written statement, all because these statements were not made voluntarily. Specifically, defendant's contentions are that these statements were not made voluntarily, because he invoked his right to silence and to have an attorney present before and during interrogation in Lee's Summit and thereafter before and during interrogation in Sedalia; that the police officers were required to, but did not, honor his request for the presence of counsel made before questioning began and during questioning.

In this connection, he relies [2] heavily upon language in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), as follows:

"The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him." 384 U.S. at 444–445, 86 S.Ct. at 1612.

This court said in *State v. Alewine,* 474 S.W.2d 848 (Mo.1971) at l.c. 852:

"The question before the trial court at the conclusion of the hearing on the motion to suppress and again during the trial on defendant's objection to the testimony of oral confession was whether the alleged statement was voluntarily given and, therefore, admissible in evidence. The question on appeal is whether the evidence was sufficient to sustain the trial court's finding that the statement was voluntarily given."

2. He also relies upon the following cases which we have considered: *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *State v. Stevenson,* 523 S.W.2d 349 (Mo.App. 1975); *Combs v. Wingo,* 465 F.2d 96 (6th Cir. 1972); *United States v. Priest,* 409 F.2d 491 (5th Cir. 1969); *United States v. Clark,* 499 F.2d 802 (4th Cir. 1974); *Carnley v. Cochran,* 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962); *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *State v. Falbo,* 333 S.W.2d 279 (Mo.1960); *Frazier v. Cupp,* 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); *State v. Mudgett,* 531 S.W.2d 275 (Mo.banc 1975).

The evidence is clear that the police officers thoroughly informed defendant of his rights on at least three occasions, that he understood what they said to him about his rights, and that he knew his rights. His answer to one question demonstrates clearly not only that he knew and understood his rights as defined by *Miranda,* but that he had committed them and their meaning to memory. The question and his answer are as follows:

"Q. Do you know what it was he read off that card?

"A. That I had the right to remain silent, that if I gave up the right to remain silent anything I could say would be used . . . . . could be used against me in a court of law, that I had the right to an attorney to have him present during the questioning, that if I did and so desired but could not afford one, an attorney would be appointed to me."

The evidence is clear that defendant signed a paper waiving his rights and consenting to take the polygraph test before any questions were asked him about the homicide. The evidence is clear that after his confession to the sheriff of the murder of Karen Jones, he signed a paper recording the confession and declaring that he had "made no request for the advice or presence of a lawyer before or during any part of [the] statement."

The evidence is conflicting as to whether he indicated that he did want to speak with an attorney and have him present during questioning by Corporal Buesing at Lee's Summit and later by the sheriff in the presence of Corporal Buesing at Sedalia. Defendant testified, in substance, that he did not tell either of them that he did not know whether he should talk to an attorney, but, on the contrary, he told them he did want to talk to an attorney before he answered any questions. The trial judge resolved the credibility question presented by this conflict between the testimony of defendant and that of the sheriff and Corporal Buesing by accepting the officers' testimony. Moreover, there is evidence, admitted at one point by defendant, that Corporal Buesing said to him that he (defendant) would have to decide, before they went any further, the question of whether he wanted an attorney present during the polygraph test. This and evidence of a similar answer by defendant in response to similar advice by the sheriff before questioning defendant in Sedalia, indirectly support the trial judge's resolution of this credibility question.

Defendant takes the position that even the State's version of what he said about whether he wanted an attorney present during interrogation at Lee's Summit and later at Sedalia amounted to such an indication of his desire to consult with an attorney as to require the officers to discontinue questioning. He argues that the State's version of what he said ("that he didn't know if he should talk to an attorney or not") together with his statement that he wanted to talk with Greg Woods about talking to a lawyer was such a clear, unequivocal expression of his desires as to require that there be no further questioning until he had been provided with a lawyer and time to consult with him.

The State takes the position that defendant's statements to the police as to whether he wanted an attorney present, including his statement that he wanted to (or "might" want to) talk to Greg Woods about talking to a lawyer, were not indications that he did wish to consult with a lawyer; that they were indications only that he did not know whether he did or not, that he was "considering" whether he needed to, and had not decided.

The trial court accepted the State's version of what defendant said and what he meant by what he said in the light of his admitted knowledge that he had the "right to have   *   *   *   [an attorney] present during the questioning   *   *   *," and determined that defendant had not indicated (1) that he did wish to have a lawyer present, or (2) that he did not wish to be interrogated.

The court in *Miranda,* 384 U.S. at 483–485, 86 S.Ct. 1602, 1633, 16 L.Ed.2d 694 recognized the problem presented by the

person advised of his rights who manifests indecision as to whether he desires counsel during interrogation. The court referred to and quoted from a letter from the Solicitor General which the court said "makes it clear that the present pattern of warnings and respect for the rights of the individual followed as a practice by the FBI is consistent with the procedure which we delineate today." We quote from that part of the Solicitor General's letter set out in the opinion (p. 485, 86 S.Ct. p. 1633) stating the Bureau's practice in a situation not unlike that presented in this case:

" ' "When the person who has been warned of his right to counsel decides that he wishes to consult with counsel before making a statement, the interview is terminated at that point, * * *. It may be continued, however, as to all matters *other* than the person's own guilt or innocence. *If he is indecisive in his request for counsel, there may be some question on whether he did or did not waive counsel.* [Emphasis added.] Situations of this kind must necessarily be left to the judgment of the interviewing Agent. For example, in *Hiram v. U. S.,* 354 F.2d 4 (1965), the Agent's conclusion that the person arrested had waived his right to counsel was upheld by the courts." ' "

The police officers in this case concluded that defendant had not indicated a desire for, but had waived counsel. These officers and defendant testified fully on this subject at the hearing on the motion to suppress. The trial judge who heard the testimony of all the witnesses and observed their demeanor at the hearing has reviewed the officers' conclusion and has made his own judgment as to what defendant said to the officers and what he meant by what he said. His (the judge's) conclusion was that defendant had not expressed a desire to consult with an attorney, but had waived that right. The evidence is sufficient to sustain that conclusion.

As to his incriminating reply to Corporal Buesing's inquiry, "should [we] be looking for other persons?" defendant claims that the reply was produced by trickery and, therefore, was not voluntarily made. In support of this contention he relies upon the following language appearing in *Miranda* at pages 455 and 476, 86 S.Ct. at pages 1617, and 1629.

" * * * When normal procedures fail to produce the needed result, the police may resort to deceptive stratagems such as giving false legal advice. * * * The police then persuade, trick or cajole him out of exercising his constitutional rights.

\*  \*  \*  \*  \*  \*

" * * * [A]ny evidence that the accused was threatened, tricked or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege."

Defendant testified that just before he made this reply, Corporal Buesing had told him that "what I [had] told him [Buesing] couldn't be used because it would be unconstitutional to convict a person on * * * the basis of a confession." Corporal Buesing testified that before defendant indicated by his reply that "[we] didn't have to look any further," he stated to defendant that the Metro Squad was developing evidence which pointed toward him as the murderer and that "there must be something besides his own admission."

Defendant contends that this is the "false legal advice" and "trickery" which produced his reply. Of course, defendant has not shown that the "advice" given was false. Assuming that the reply was produced by trickery, this does not necessarily make the reply involuntary and, therefore, inadmissible in evidence. Defendant does not contend that his will was overborne as a result of Corporal Buesing's statement. The evidence supports the trial court's conclusion that this incriminating reply was in fact voluntary, and in these circumstances, we will not say that the trial court erred in overruling the motion to suppress and in admitting the reply in evidence. *Frazier v. Cupp,* 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); *State v. Stubenrauch,* 503 S.W.2d 136, 138[3, 4] (Mo.App.1973).

As indicated, we determine that the evidence was sufficient to sustain the trial court's finding that defendant's oral and written statements to the police were made voluntarily. The court did not err in overruling the motion to suppress and in admitting these statements in evidence.

The judgment is affirmed.

MORGAN, C. J., and FINCH, DONNELLY and RENDLEN, JJ., concur.

BARDGETT and SEILER, JJ., dissent in separate dissenting opinions filed.

BARDGETT, Judge, dissenting.

I respectfully dissent. For the purpose of clarity and continuity I will set forth the facts as I see them from the record.

In addition to the written statement given by the appellant, there was an oral statement which the trial court also admitted into evidence over objection. The primary issues in this case are: 1) did the appellant at any time during his interrogation assert his right to speak with an attorney; 2) if he did assert that right, at what point in time did he do it; and 3) did he waive that right? There is some disagreement on the facts of this case, specifically, what exactly was said about requesting an attorney and when was it said?

On August 15, 1973, appellant went to the police in Sedalia of his own volition to be questioned about a murder which had occurred on August 13, 1973. At this time appellant was given the *"Miranda"* warnings which he acknowledged he understood. Nothing occurred during this interrogation to further implicate the appellant. He claims, however, the police told him they were not satisfied with his answers and if he did not "come clean" they "would put the B" on him. He took this as a threat to give him a polygraph test. The police, however, stated they only asked the appellant whether he would be willing to take a polygraph test to which he answered yes.

The next morning appellant arrived at the Pettis county courthouse in Sedalia in order to be transported to highway patrol troop A headquarters at Lee's Summit

where the polygraph test would occur. At approximately 11:30 a. m., the appellant was ushered into a room where Corporal Merl Buesing was to conduct the test. When appellant entered the room, Buesing presented him with a waiver form which advised that appellant had the right to remain silent, that anything he said could be used against him in a court of law, he had a right to talk with an attorney and have him present during questioning, and if he could not afford an attorney one would be appointed. Buesing then explained to appellant how the polygraph machine operated. At this point, according to Buesing, the appellant said something to the effect he didn't know whether he should have an attorney or not. According to Buesing he told appellant he would have to decide before they went on. There was a fifteen-second pause after which Buesing began asking more questions and explaining the operation of the polygraph machine. Shortly after the mention of an attorney, the appellant signed the waiver form.

The appellant's memory of this event is somewhat different from Buesing's account. According to appellant after the rights were read to him Buesing asked whether appellant wanted to go ahead and talk, to which appellant replied, "I think that I would rather see an attorney before I answer any questions." Furthermore, a friend of appellant's, Greg Woods, knew some attorneys in Sedalia and appellant wanted to speak with Woods. According to appellant, Buesing said he would make arrangements for appellant to meet with Woods when he returned to Sedalia. After this, the appellant signed the waiver form.

Buesing then conducted the polygraph test. After the test was concluded, Buesing continued to question appellant about the murder. Buesing asked the appellant whether the police had to look any further, to which appellant answered "no". Right after this, appellant stated once again he didn't know if he should talk to an attorney or not. On cross-examination Buesing agreed that appellant had mentioned that he might want to talk with Greg Woods

about a lawyer, but Buesing could not remember when. After the appellant's second statement about seeing a lawyer, Buesing did not ask any more questions of appellant. Buesing then called Sedalia to ask them if they could have Greg Woods at headquarters because appellant wanted to speak with Woods and he informed them appellant might want to talk with an attorney. According to appellant, after he answered "no" to the question of whether the police had to look any further, Buesing brought up the subject of Greg Woods and where he could be found.

Officer Donley who was listening to the questioning from an adjoining room remembered that toward the end of the questioning the appellant mentioned he might want to talk with an attorney and Greg Woods. Donley did not remember a similar conversation having occurred earlier.

Prior to the time appellant answered the question about looking any further, Buesing made a statement about corpus delicti and the use of confessions. According to Buesing he told the appellant something to the effect, "[t]hat the Metro Squad was developing evidence in the case which was pointing more and more to him [appellant] and that this evidence would be necessary in making a case against him besides . . . there must be something besides his own admission." Buesing acknowledged on cross-examination that he said something to the effect that an out-of-court statement could not be used to convict without the establishment of the corpus delicti. Appellant claims that Buesing told him it would be unconstitutional to convict someone on the basis of a confession.

Buesing testified that after the appellant made this second request for a lawyer, he ceased questioning appellant and left the room. He testified further that while out of the room he placed a call to the police in Pettis county to tell them the appellant had asked to speak with Greg Woods about finding a lawyer and that appellant might want to speak with an attorney. In addition Buesing asked that arrangements be made to bring Woods to the Pettis county

courthouse so he could speak with the appellant. Corporal Buesing told appellant that he had arranged for appellant to see Woods. Buesing stated that at the time he made the arrangements for appellant to see Woods he knew the reason why appellant wanted to do so was because "He [appellant] said he wanted to talk to him [Woods] about a lawyer." There is also testimony from the sheriff of Pettis county that he had been advised the appellant might want to talk with an attorney. In turn, the sheriff advised the prosecuting attorney of what he had learned. The prosecuting attorney then contacted Judge Frank Armstrong of Pettis county about the availability of an attorney should the appellant request one. The judge informed the prosecuting attorney that Adam Fischer was next on the appointment list and if a request for an attorney developed Fischer should be considered appointed. The prosecutor contacted Fischer around 5:00 p. m. in order to know where he could locate him if he needed to get in touch with him.

After calling Sedalia, Buesing, Donley, and the appellant went to a restaurant in Lee's Summit. Buesing and Donley then transported appellant back to Sedalia where he was again questioned, this time by the sheriff of Pettis county and Buesing. Before the questioning began, the sheriff read appellant the Miranda warnings. According to the sheriff when he asked the appellant whether he wanted to talk, the appellant responded that he didn't know whether he should talk without consulting a lawyer. The sheriff testified he reiterated that it was up to the appellant to decide if he wanted to speak with an attorney or he could talk about the murder. According to the sheriff, "He [appellant] said he guessed he would."

The appellant's version is somewhat different. He remembers the sheriff reading him the Miranda warnings but claims he was distracted by something Buesing said and the last thing he remembers was the sheriff asking whether he understood his rights. To this the appellant says he responded, "Yes I do." But when the sheriff

went ahead with his questions the appellant claims he stopped the sheriff and said, "I would rather see an attorney before I answered any questions." According to the appellant the sheriff then left the room for the purpose appellant thought of calling a lawyer. But when the sheriff returned he was carrying a typewriter. The sheriff then proceeded to take a statement from appellant which was typed out and which · appellant signed.

The first issue presented by appellant is whether it was proper for the trial court to have admitted into evidence the appellant's response to Buesing's question, "do we have to look any further?" This is essentially a two-part question: 1) whether the appellant asserted his right to speak with an attorney, and 2) if he did assert that right did he subsequently waive that right?

In *Miranda v. Arizona,* 384 U.S. 436, at 474, 86 S.Ct. 1602, at 1628, 16 L.Ed.2d 694 (1966), the U. S. Supreme Court set forth a rule that, "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present." In the instant case there is a discrepancy in the testimony between the appellant and Buesing as to what was actually said with respect to a request for an attorney. According to appellant he made an unequivocal request to consult with an attorney, i. e., "I think I would rather see an attorney before I answer any questions." On the other hand, Buesing testified that the appellant merely said, "he didn't know whether he should have an attorney or not." It is unnecessary for us to decide whether the appellant's or Buesing's version of what was said constituted a sufficient assertion of appellant's right to speak with a lawyer because we have found he effectively waived this right when he signed the waiver form.

Just because a person in custody invokes the right to speak with an attorney does not preclude him from waiving that right later and proceeding to talk with the authorities. In *United States v. Scogin,* 459 F.2d 182 (8th Cir. 1972), the defendant sought to suppress as involuntarily made certain oral and written statements given to the police in which she acknowledged her complicity in a crime. She was given the full *Miranda* warnings and responded that she understood her rights. Prior to answering any questions, she unsuccessfully attempted to call an attorney after which she was rewarned of her rights which she waived and then submitted to interrogation. With regard to the waiver of one's rights after requesting to speak with an attorney, the court said at 184: "The mere fact that she was unsuccessful in reaching an attorney does not prohibit interrogation where it is clear that she knowingly, intelligently, and voluntarily elected to proceed without one." See also *United States v. Marchildon,* 519 F.2d 337 (8th Cir. 1975), wherein this principle was reiterated.

The instant case is similar to *Scogin.* Assuming arguendo the appellant actually did request a lawyer, the evidence shows he "knowingly, intelligently, and voluntarily" waived that right when he signed the waiver form. There is no evidence to suggest the appellant was forced, pressured, or compelled to make a statement. All Buesing said was the decision was up to the appellant. The record shows the appellant was read his rights on the previous day at which time he said he understood them; he was read those same rights before he was given the polygraph test and he said he understood them. Not only did he say he understood them but he signed a form in which he waived his right to remain silent and talk with an attorney. The state has successfully met its heavy burden of showing the waiver was made knowingly and voluntarily.

Next the appellant suggests his answer to Buesing's question, "do we have to look any further", was not made voluntarily because he was tricked and deceived into giving the answer by what Buesing said about the necessity of establishing a corpus delicti before a confession would be admissible. The appellant directs the court's attention to two quotes from *Miranda* where the court said at 455 and at 476, 86 S.Ct. at 1617, and at 1629: "When normal proce-

dures fail to produce the needed result, the police may resort to deceptive stratagems such as giving false legal advice . . . The police then persuade, trick or cajole him out of exercising his constitutional rights." ". . . any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege."

Even if a statement is obtained by trickery, it does not necessarily mean that it should be suppressed. In *State v. Stubenrauch*, 503 S.W.2d 136 (Mo.App.1973), the defendant claimed his statements should have been suppressed because the police obtained them by deceiving him into believing other persons had implicated him. Assuming this to be true, the court of appeals still held the confession obtained was admissible. *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969), is cited as authority for the proposition that, although the defendant has in some way been deceived into confessing, his confession is admissible where he has been previously advised of his rights.

The rule with respect to the exclusion of confessions has been stated in other jurisdictions to be that confessions obtained by fraud, trickery, or deception will not be suppressed unless the subterfuge was likely to produce an untrustworthy confession. *Commonwealth v. Jones*, 457 Pa. 423, 322 A.2d 119 (Pa.1974); see generally Anno., 99 A.L.R.2d 772. In *Jones* the court also said a confession should be suppressed where the degree of subterfuge so offends the societal notions of fairness. In the case at bar the statement had no signs that it was untrustworthy or was the degree of subterfuge so reprehensible as to cause the statement to be excluded on this ground alone. However, I believe this is a factor to be considered with reference to the question of waiver of right to an attorney which is the next issue.

The appellant's next contention is that the trial court erred in admitting the written statement into evidence. From all the facts it seems apparent the appellant asserted his right to speak with a lawyer at approximately 3:30 p. m., shortly after he answered Buesing's question, "do we have to look any further". Again, there are two different versions of what transpired, but even taking the state's version it is clear the appellant asserted his right to speak with an attorney. According to the state's evidence, the appellant stated only that "he didn't know whether he should talk to an attorney or not", and he had a friend in Sedalia, Greg Woods, who knew some attorneys and he would like to speak with Woods. The appellant's first statement in conjunction with his request to speak with Greg Woods who knew some attorneys was tantamount to a request to see an attorney. There is no question but what appellant's request to Corporal Buesing at Lee's Summit about talking with Greg Woods with respect to getting a lawyer was understood by Buesing to be an exercise by appellant of his rights as explained to him in the *Miranda* warnings. Buesing immediately stopped questioning appellant and telephoned Sedalia in order to accommodate appellant's request with respect to Woods and finding a lawyer. Although appellant's requests were all oriented toward talking with a lawyer, the authorities in Sedalia after receiving Buesing's call merely made some tentative arrangements so as to be able to contact a lawyer later, which they never did. Furthermore, Buesing told appellant that Woods would be available in Sedalia when they arrived.

There is no doubt that once an individual has asserted his right to speak with an attorney that he may at a later time under certain circumstances waive that right. *Brewer v. Williams*, 430 U.S. 387, 403, 92 S.Ct. 619, 30 L.Ed.2d 618 (1977); *United States v. Clark*, 499 F.2d 802 (4th Cir. 1974); *United States v. Scogin, supra.*

It is important to note at this point that waiver is not something which is lightly found by the courts. *Brewer, supra*, at 404, 92 S.Ct. 619. In order to establish a waiver under federal constitutional law, it is "incumbent upon the State to prove 'an intentional relinquishment or abandonment of a

known right or privilege.' " *Id.*, quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 146 (1938).

"It has been pointed out that 'courts indulge [in] every reasonable presumption against waiver' of fundamental constitutional rights and that we 'do not presume acquiescence in the loss of fundamental rights.' A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background experience and conduct of the accused." *Id.* In addition, it should be remembered that the state has a heavy burden of proof when it comes to showing the appellant knowingly, intentionally, and voluntarily waived his right to counsel. *Brewer, supra; Scogin, supra.*

In the instant case the state has failed to carry that burden with regard to the written confession elicited from the appellant in Sedalia.

The evidence shows the appellant asserted his right to counsel at approximately 3:30 p. m. in Lee's Summit and that Buesing recognized this, i. e., stopped interrogation, and placed a call to Sedalia. The evidence also shows that when appellant was returned to Sedalia the sheriff rewarned appellant of his rights and initiated further interrogation. At some point after the reading of the rights or after the interrogation had begun, the appellant made another request for an attorney. The sheriff's version is that appellant said something to the effect he didn't know whether he should go on talking without an attorney. The appellant's version is that after he said he understood his rights the sheriff began to question him to which appellant responded, "I would rather see an attorney before I answered any questions." Whichever version of this colloquy is correct is unimportant because the appellant had already asserted his right to speak with an attorney. The real question is whether he waived that right.

According to the sheriff, after appellant mentioned the attorney, he told appellant it was appellant's decision to either speak with an attorney or talk about the murder. The sheriff testified that "He [appellant] said he guessed he would", meaning he would talk to the police. I am of the opinion that this did not constitute a valid waiver under the circumstances of this case. These circumstances are: 1) appellant effectively asserted his right to speak with an attorney; 2) the police a few hours later at their own initiation began to reinterrogate the appellant; 3) there was nothing to suggest prior to the interrogation in Sedalia that the appellant had changed his mind about seeing an attorney; 4) the appellant reiterated his desire to speak with an attorney; 5) the police attempted to get the appellant to change his mind by telling him the decision was his; 6) the appellant responded half-heartedly and somewhat equivocally that he "guessed he would" talk; and 7) appellant responded to an earlier inquiry by saying the police didn't have to look any further on the false premise put forth by the officer that a statement alone could not convict appellant when the officer knew there was a provable corpus delicti.

These facts present a situation where the appellant half-heartedly submitted to police interrogation after their repeated attempts to get him to talk as well as their repeated disregard of his request for a lawyer. In our opinion, the repeated attempts to question the appellant and the subtle attempts to influence the appellant by telling him it was his decision resulted in coercion on the part of the authorities. Under some circumstances, the phrase "I guess I would" might constitute a valid waiver, but here it appears to be a statement made in desperation because the authorities obviously were not going to allow the appellant to speak with Woods about an attorney.

In *United States v. Clark*, 499 F.2d 802 (4th Cir. 1974), the defendant was taken into custody as a suspect in a bank robbery and was taken before a magistrate who determined he was not entitled to a court-appointed attorney. That same day the

F.B.I. read the defendant his rights and questioned him about the robbery. At approximately 4:30 p.m. while the F.B.I. was interrogating him the defendant requested to see an attorney. At this point the questioning ceased. Later that day, at about 8:00 p.m., an F.B.I. agent initiated a conversation with the defendant in which he asked whether the defendant would submit to further questioning. The defendant reiterated his desire to speak with an attorney. The agent in turn told the defendant he might as well talk because eventually the police would find him out if he wasn't telling the truth. The agent then read the defendant his rights which the defendant acknowledged, but he refused to sign the waiver form. During the questioning which proceeded the defendant confessed.

The court held the confession should have been suppressed on both Fifth and Sixth Amendment grounds. The court singled out a number of factors which were the key to its determination that the confession was not voluntary. The court first remarked "evidence that an accused has previously asserted his right to confer with counsel is a factor which weighs heavily against finding that a subsequent uncounseled confession is voluntary." 499 F.2d at 807. Another factor, according to the court, which pointed towards involuntariness is the initiation by the authorities of a subsequent interview in which a confession is elicited. This factor is even more important where there is no evidence to indicate that the decision to conduct a second interview was made as a result of new facts or the defendant's change of mind.

The instant case presents the same elements which suggest involuntariness as those presented in *Clark*. Considering the above factors and the evidence in this case, I cannot conclude the state has carried its heavy burden to show that appellant knowingly, intelligently, and voluntarily waived his rights.

The court in *Clark*, quoting from *United States v. Crisp*, 435 F.2d 354, 357 (7th Cir. 1970), states at 807 that, "[o]nce the privilege has been asserted, . . . an interrogator must not be permitted to seek its retraction, total or otherwise." I do not agree with this rule as it is stated in *Clark*. There may be some circumstances in which an interrogator might be authorized to seek a retraction and, therefore, an inflexible rule such as this would be unworkable. I express no further opinion as to what those circumstances might be. See *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), for a discussion of the result of such an inflexible rule with regard to a person's right to remain silent and thereby cut off a custodial interrogation.

I am mindful of the recent case of *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), which concerns a situation where a person voluntarily appears at a police station, is never in custody, and is free to depart at any time, which Mathiason did. The immediate distinction between *Mathiason* and the instant case is that Mathiason never asked to see a friend or an attorney whereas, here, appellant sought to take proper advantage of his right to see a lawyer and was frustrated in the attempt by the authorities. It also seems clear that after appellant acknowledged to Buesing that the police need look no further the appellant was certainly in custody and remained in custody throughout the questioning by the sheriff and Buesing in Sedalia. Appellant was not free to leave.

Appellant's efforts to exercise his rights by talking with Woods about getting a lawyer were forestalled by the delaying tactics of the authorities. The right to see a lawyer having been clearly invoked by appellant, it then became the obligation of the state to show that appellant thereafter freely and voluntarily waived that right. See *Miranda v. Arizona*, 384 U.S. 436, 473, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *People v. Ireland*, 70 Cal.2d 522, 75 Cal.Rptr. 188, 194–196, 450 P.2d 580, 586, 588 (Banc 1969); *People v. Harris*, 552 P.2d 10 (Colo.banc 1976); *People v. Parnell*, 31 Ill.App.3d 627, 334 N.E.2d 403 (1975). In my opinion, the state has failed to sustain its burden on this issue. The statement or confession given to

the sheriff and Buesing by appellant after their return to Sedalia is, I believe, for the reasons stated supra, inadmissible and the trial court erred in admitting that statement into evidence over appellant's objection.

I would reverse the judgment and remand the case for a new trial and, therefore, I dissent.

SEILER, Judge, dissenting.

This is one of those cases where we must bear in mind that "[N]othing we write . . can bring back the victim of this tragedy" and that its emotional aspects "do not qualify our obligation to apply the law with the eye to the future", *Brewer v. Williams*, 430 U.S. 387, 415, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) (Stevens, J. concurring), realizing also that it is "equally important that the police, as guardians of the law, fulfill their responsibility to obey its commands scrupulously", *Brewer, supra*, at 407, 97 S.Ct. at 1244, (Marshall, J. concurring).

There are two constitutional rights here which the police deliberately and successfully played against each other: the Fifth Amendment right not to incriminate oneself and the Sixth Amendment right to counsel. By falsely assuring defendant that he could not be convicted on his confession alone (well knowing that they had ample evidence elsewhere of the corpus delicti), thus inducing a belief that he would not incriminate himself by confessing, the police at the same time encouraged defendant to waive his right to counsel, as there would be no reason to wait for counsel's advice before speaking if by speaking he would not incriminate himself.

It was clear from the beginning that defendant did not himself know a lawyer to call, but that he had a friend, Greg Woods, who did know some good lawyers and that defendant would decide from talking with Woods whom to call. Many persons, especially in walks of life where resort to a lawyer is something strange and unusual, select a lawyer by obtaining a recommendation from a friend who knows a good lawyer. All lawyers know this to be true.

This is what defendant was trying to do here and the police knew it. Corporal Buesing knew it and so did the sheriff, both of whom were key figures in the interrogation of defendant in violation of his constitutional rights. Defendant's halting attempts and starts toward obtaining a lawyer through the help of a friend were effectively neutralized by the police disregarding his obvious desires while at the same time giving him self-serving advice on the value of his Fifth Amendment interests.

The principal opinion disposes of this by saying that even if trickery were involved it does not follow that defendant's reply was involuntary and hence inadmissible. But this ignores the fact that even if the response were voluntary, it was brought about by indirectly persuading defendant to forego consulting with counsel and that is not permissible under *Brewer v. Williams, supra,* which is the leading and most recent opinion on this point by the United States Supreme Court and which is not explained or distinguished in the principal opinion. It makes no difference whether it was voluntary or not, *Brewer v. Williams, supra.* In *Brewer* the Court found it unnecessary to consider whether the incriminating statements were involuntary because in any event the judgment granting a new trial had to be affirmed on the ground defendant was deprived of his constitutional right to counsel. *Id.* at 397–98, 97 S.Ct. 1232.

What the police did in the case before us was improperly to qualify defendant's belief that he needed a lawyer and then proceed to use this to obtain as much incriminating information as they could.

I therefore respectfully dissent and would reverse and remand.