**STATE of Missouri, Respondent,**

v.

**Katherine Christine KURTZ, Appellant.**

No. 60214.

Supreme Court of Missouri,
En Banc.

April 10, 1978.

Rehearing Denied April 28, 1978.

Clifford C. Schwartz, Jr., Clayton, for appellant.

John D. Ashcroft, Atty. Gen., Frank J. Murphy, Asst. Atty. Gen., Jefferson City, for respondent.

PER CURIAM:

This case was transferred to this court by the Court of Appeals, St. Louis district, on motion of appellant after opinion. Rule 83.02. We adopt portions of the opinion of the Court of Appeals.

Katherine Christine Kurtz (appellant) was found guilty by a jury of the murder of her husband, Michael Kurtz, and she appealed from the judgment sentencing her to life imprisonment.

Appellant does not challenge the sufficiency of the evidence except to assert that "absent the confession and statement against interest," the admissibility of which she challenges, there was not sufficient credible evidence upon which to base a finding of guilty. From the evidence that was admitted, including the challenged evidence, a jury reasonably could find that Michael Kurtz died as a result of arsenic poison administered to him by appellant with intent to kill.

Appellant's first point is that the trial court erred in permitting the prosecutor to tell the jury in his opening statement that the evidence would show that immediately prior to the death of her husband, appellant was having "an affair" with a man named Allen. The objection was that such evidence would be "immaterial and irrelevant to any of the issues involved," and "there is just no such evidence."

The contention is totally without merit. The fact that immediately prior to the death of her husband appellant was having an "affair" with another man would tend to establish motive, which may be proved by the State, *State v. Stapleton*, 518 S.W.2d 292 (Mo.banc 1975). Appellant does not assert that it was error to admit evi-

dence that she was having an "affair" with Allen. Moreover, she elected to testify and admitted on direct examination that she did have such "an affair."

■ Dr. Robben was permitted to testify that after Michael Kurtz was admitted to the hospital his condition became critical, and he attempted to locate appellant at her home and also at the hospital but could not find her. Appellant assigns the admission of this testimony as error. She asserts that it was of an inflammatory nature which did not tend to prove or disprove any factual issue. This testimony tended to show appellant's indifference and lack of concern for her husband whom she knew had been taken to the hospital in a serious condition. When one is accused of the murder of another, it is proper to show the feelings that existed between them immediately prior to or at the time of the occurrence. *State v. Johnson,* 349 Mo. 910, 163 S.W.2d 780 (1942). The testimony was properly admitted.

Appellant next asserts prejudicial error resulted from the admission in evidence of "certain oral and written statements made by [her] while in custody." She contends that the court erred in holding that the statements were "exceptions to the hearsay rule" and that they were "voluntarily made."

We note here that neither in the point nor in argument is there any reference to specific statements alleged to be hearsay. Also, appellant asserts in argument that "the police officers involved failed to warn her of her constitutional rights." She relies on *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The record clearly shows that the "Miranda" warnings were read to her on two occasions, and that she signed a paper before any questioning occurred acknowledging that she understood her "rights" and "waived" them. Also, the "oral * * * statements" are nowhere identified in appellant's brief. However, from the transcript we determine that appellant apparently refers to statements made by her to Officer Bright prior to making a written confession, and to a cellmate while she was confined.

■ Appellant was in custody at the time she made the statement to her cellmate, but she was not being interrogated by the police and the statement was not the product of in-custody interrogation. Instead, it was a voluntary statement to a fellow prisoner, and was not within the purview of *Miranda v. Arizona, supra. State v. Mitchell,* 491 S.W.2d 292 (Mo.banc 1973).

■ Without detailing the circumstances or the method or means allegedly employed, appellant argues that during the interrogation she was "under compelling influences to make said statements"; that the "interrogation practices" of the police created an environment which was likely to exert such pressure as "to disable her from making a free and rational choice"; that the "duration of the examination" was such as to render her "mentally and emotionally incapable of making any voluntary statement"; that she was "thrust into an unfamiliar atmosphere and run through menacing police interrogation procedures"; that she was held in "lengthy interrogation and incommunicado incarceration" before she made the statements, and that she was "tricked and cajoled into a 'waiver' and the making of the statements." These conclusionary statements are not borne out by the record. Nor are they, or the ultimate facts upon which they are supposedly based, asserted as grounds for the motion to suppress.

Appellant was given the "Miranda" warnings shortly after she arrived at the police station. She was not among strangers because she was previously acquainted with at least one of her interrogators, and not because of any previous criminal activity. The first period of interrogation lasted a little less than two hours, and there was a five-hour interim before she was again questioned. During that period she was in the office of the police station, not in the holdover cell as appellant asserts in her brief. She was offered food and water. When she went to the police station her aunt went with her, and her aunt stayed

there about four hours and left only because of reasons personal to her. The police called a priest at appellant's request, and he was permitted to talk to her in private. The private conversation occurred shortly after she signed the confession, but she had the opportunity to talk to him before she completed the confession and signed it. When she did confer in private with the priest she apparently made no complaints to him concerning the confession or her treatment. Appellant did not testify to any abuse, and she did not disagree with the officers as to the duration of the questioning. She testified that one of her children was in the hospital and her son was alone, and that she was "upset" and "wanted to get home to my little boy and get my little girl out of the hospital," and that she "wanted to be left alone." She stated that she "was very, very nervous and  *  *  * told them [she] would sign anything just to be left alone," and that the officer had also promised to take her to County Hospital to get a tranquilizer.

█ The trial court heard evidence in support of appellant's motion to suppress. It found and determined that her oral statements and written confession to the police were made voluntarily and, therefore, were admissible in evidence. The evidence was sufficient to sustain the trial court's finding and determination of voluntariness. *State v. Alewine*, 474 S.W.2d 848, 852[3] (Mo. 1971); *State v. Phillips*, 563 S.W.2d 47 (No. 59379) (Mo.banc 1978). Moreover, essentially the same evidence was presented to the jury, and the jury was given an instruction submitting the issue of whether the oral statements and confession made were voluntary or not.

During the time appellant was being questioned by the police she indicated a desire to see Father Robert Osborne, a priest. The police immediately contacted him and he arrived at the police station while she was making an oral statement. After a short waiting period, he conferred in private with her. When Father Osborne was called as a witness, appellant objected to "any statements made to [him] for the

reason that he is a Catholic priest who, apparently came and talked with [her] in the police station."

Father Osborne testified that when he first saw appellant "in the room where they [the police] were talking to her," she "appeared very subdued, I would say quiet"; she was not crying. He also testified that he heard no one raise his voice to her and saw no treatment of her that he considered to be harsh.

█ Appellant argues that the testimony of Father Osborne "was in violation of the sacred privilege between priest and parishioner," and she cites and relies on the provisions of § 491.060, RSMo 1969. This section provides that "[a] minister of the gospel or priest of any denomination [shall be incompetent to testify] concerning a confession made to him in his professional character, in the course of discipline enjoined by the rules of practice of such denomination."

It is clear that in testifying to the matters stated above the priest did not testify "concerning a confession made to him in his professional character, in the course of discipline enjoined by the rules of practice" of the Catholic church. See *State v. Morgan*, 196 Mo. 177, 95 S.W. 402 (1906). He testified only to what others did or did not do, and to those matters that were said or done by appellant in the presence of others. For a comparable situation but involving medical personnel, see *State v. Burchett*, 302 S.W.2d 9 (Mo.1957).

█ Father Osborne also testified that when he talked to appellant alone, she was quiet and able to talk, and that he had no problem communicating with her but "those kind of circumstances" made communications difficult. Appellant argues that the statutory rule of exclusion contained in § 491.060, supra, "would touch anything concerning the communication including [her] demeanor." No authority is cited.

At common law there was no privilege as to a communication or confession to a clergyman. 97 C.J.S. Witness § 263. The tendency of the courts is toward a strict construction of statutes such as § 491.060, *su-*

*pra.* 81 Am.Jur.2d Witnesses § 284. The case with the nearest analogy is *Buuck v. Kruckeberg*, 121 Ind.App. 262, 95 N.E.2d 304, 306 (1950). It was there held that it was error to exclude the testimony of a minister regarding his opinion of the soundness of mind of a person when that opinion was based on his observations of the person while serving in the capacity of her clergyman. The court said: "These rulings [sustaining the objection to the opinion and striking out all previous testimony] were made upon the theory that the testimony of the witness concerned matters communicated to him as a clergyman as to which he is made an incompetent witness [by statute]. The statute, however, made the witness incompetent only as to 'confessions and admissions' made to him 'in course of discipline enjoined by' his church. It is apparent that the testimony of [the minister] concerned neither a confession nor an admission on the part of [the grantor] made to him in the course of any disciplinary action enjoined upon him by his church. He was clearly a competent witness and it was error to strike out his testimony and to refuse to receive his opinion based thereon as to [the grantor's] soundness of mind." See also *Schaeffer's Estate*, 52 Dauph. Co. 45 (Pa.1941), where testimony of a minister was held to be proper when based on personal observations as distinguished from communications. The trial court did not err in overruling appellant's objections to the testimony of Father Osborne.

Appellant's next two points, considered together, are that the trial court erred when it permitted Albert Chasteen, a police officer investigating the case, to "testify as to his step by step police work and preparation which was immaterial and irrelevant to any of the issues in the case," and to relate why he picked up a book on criminal investigation which he found in appellant's home.

In argument appellant asserts that prejudicial error occurred when Officer Chasteen was permitted to testify that he sent word to another officer to pick up two persons by the name of Ramey and Allen. The record shows the officer testified that during the interrogation of appellant, she stated that when her husband had eaten dinner one evening these two friends were present who also ate dinner. Officer Chasteen was then asked what he did with that information, and over appellant's objection that it was hearsay and "investigative work," he testified that he asked other police officers to locate those two persons.

Appellant also mentions in argument that Officer Chasteen was "permitted to testify that he had talked to other people about who should take a polygraph test and in what order they should take it." Officer Chasteen did testify that he had such a conversation with Officer Bright, but he did not testify as to what was said.

It was not Officer Chasteen but Officer Crosswhite who testified that he seized a book entitled *Fundamentals of Criminal Investigation* in appellant's house, and he stated that "the purpose [was to have] it examined for fingerprints." There subsequently was testimony that appellant's thumbprint was found on page 507 of the book.

■■■ We do not consider it necessary to determine whether, strictly speaking, these items of evidence were admissible. The testimony did tend to present a more complete picture of the step-by-step investigation made by the police, but when viewed separately it is difficult to find that the particular item of evidence was material or relevant to any issue in the case. However, assuming the testimony was objectionable for the asserted reasons, we are unable to find any prejudice to appellant. "Every error which might occur in the trial of a case does not necessarily require the granting of a mistrial," *State v. Smith*, 431 S.W.2d 74, 82 (Mo.1968), and this would be equally true as to reversing a judgment on appeal. *State v. Spica*, 389 S.W.2d 35 (Mo. 1965). Only prejudicial error requires the reversal of a judgment. *State v. Gibson*, 502 S.W.2d 310 (Mo.1973); *State v. Phelps*, 478 S.W.2d 304 (Mo.1972).

■■■ Appellant also contends that since the court gave an instruction on murder,

first degree, it was required by note 6 of the Notes On Use of MAI–CR 6.02 (effective March 1, 1975) to also give instructions on murder, second degree, and manslaughter; that the court erred to her prejudice in failing to give these instructions. Appellant acknowledges that the court's failure to give these instructions was not assigned as error in her motion for new trial, but she asks that we consider the alleged error under the plain error rule (Rule 27.20(c)) and reverse the judgment. We have reviewed the case and do not deem that manifest injustice or miscarriage of justice resulted from the failure to give these instructions.

The judgment is affirmed.

All concur.