STATE of Missouri,
Plaintiff-Respondent,

v.

Angelo Louis HUGHES,
Respondent-Appellant.

No. 41125.

Missouri Court of Appeals,
Eastern District,
Division Three.

Jan. 29, 1980.

James W. Whitney, Jr., Clayton, for defendant-appellant.

John Ashcroft, Atty. Gen., Paul Robert Otto, Asst. Atty. Gen., Jefferson City, Courtney Goodman, Jr., Pros. Atty., Steven H. Goldman, Asst. Pros. Atty., Clayton, for plaintiff-respondent.

CRIST, Judge.

Defendant Angelo Hughes was convicted by a jury of murder in the first degree and sentenced to life imprisonment. Defendant challenges the admission into evidence of his incriminating statements made to the police and the results of his polygraph test. We affirm.

The charges against the defendant arose out of a robbery and shooting at Ruth's Food Shop, 6508 Pasadena, Pine Lawn, in St. Louis County, on January 27, 1978. The proprietor of the shop, his wife, and his daughter were killed.

State's witness Willie Hardin pled guilty to a similar charge arising out of this incident and received a fifteen-year sentence in exchange for his testimony against the defendant. He testified as follows: He went to the food shop on January 27, 1978, in the company of the defendant and one Jerome "Jumpy" Downs. The defendant, Downs, and Hardin arrived at the food shop at approximately 1:00 p. m. They parked across the street in the Garfield School parking lot. Defendant and Downs entered the store through the front door. Soon thereafter Hardin heard two gun shots. He went to the front door and was admitted into the shop by Downs. Upon entering the building, he observed the defendant taking some money and cigarettes from behind the counter. Downs was standing at the door with a .38 pistol. After seeing the bodies of the proprietor and his wife, Mr. and Mrs. Green, on the floor, Hardin saw their daughter at the front door and then at the side door. Downs pulled the daughter inside the store and shot her. At the time of the shooting, defendant was standing in the same room eating a candy bar. The three then ran out of the store and drove away.

■ Defendant contends the incriminating statements he made to police subsequent to his arrest were involuntary. The burden of proving the statements were voluntary by a preponderance of the evidence is thus placed on the state. The state must show compliance with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *State v. Olds*, 569 S.W.2d 745, 751 (Mo. banc 1978).

Defendant contends the trial court should have sustained his objections and his motion to suppress the allegedly involuntary statement since: (1) he was denied an attorney; (2) he was questioned too long; and (3) the statements were made after police officers promised nothing would happen. We disagree.

The state's evidence bearing on the issue supported the following factual setting. On February 2, 1978, at about 12:15 p. m., police officers arrested the defendant. After his arrest, one of the police officers gave defendant his *Miranda* rights from memory. Another police officer read defendant his *Miranda* rights from a card explaining those rights. Defendant indicated that he understood his rights. He was advised that he was being arrested for the murder of three members of the Green family.

Defendant was taken to the Northwoods Police Station. While waiting in the holdover, he began asking Officer Jones questions such as whether anyone had said that he was at the scene or that he had killed the Greens, or whether anyone had said what kind of car was used. Officer Jones did not answer. Defendant was coherent at this time.

Defendant was then taken to the Pine Lawn Station. There he was interrogated by the Major Case Squad investigating team. Defendant was not continually questioned. He did not complain. He was not threatened. He appeared nervous rather than tired. He was not in shock. He did not express a desire to remain silent.

At about 6:30 p. m., defendant was taken to the Florissant Police Department to take a polygraph examination. Defendant was given his *Miranda* rights orally and he signed a written form waiving those rights. Defendant stated that he understood his rights. He did not ask for a lawyer and did not indicate a desire to stop the test. The waiver and consent form was executed at 6:41 p. m. Two tests were given. The defendant refused to take a third test. After the first test, defendant admitted he had been lying and that he had been at Green's store, but stated he was outside near the car and not inside the building. This polygraph examination was not admitted into evidence.

At about 8:30 p. m. that evening, defendant was returned to the Pine Lawn Police Station. Questioning by the police officers resumed. Defendant was again reminded of his *Miranda* rights. He indicated that he understood and would answer any questions they had. He did not, at that time, request a lawyer. A tape was made of the interrogation.

The recorded statement began with the defendant relating that he did not know what happened. He was with Hardin, Downs, and one Tony Phipps but did not know they were going to rob the store and kill the people. Then he said he had been lying about the whole thing. He was urged to tell what he knew about the incident. The defendant asked, "What's going to happen to me?" The police officer replied, "If you're not inside the store, you cooperate with us, probably nothing. Did you pull the trigger?" The defendant indicated that he did not pull the trigger, that he was in the car when the two other men returned to the car with a paper sack, and that he did not know what happened inside. The officer continued to ask defendant for the facts, and he continued to state that he did not know what had happened in the store. The police officer then stated, "If you went inside the store Angie if you would talk to us, talk to us now, it wouldn't make any difference cause you didn't shoot the people. Did you?" The defendant answered, "Right. No."

Upon being questioned about where the parties were sitting in the car, the defendant answered:

"A  Man, just punish me man, cause I don't know what to do or what to say or who to talk to.  Punish me, cause but I wasn't the one in the store.  I don't know what you want to know, how you're going to find out the rest of the information, but that's all I know, I wasn't in the store."

The interrogation then ended with the following:

"Q  The only thing you've told me so far is that Willie and his two friends you were carrying around were talking about making some money and you needed some gas money.  You needed gas money you pulled down in front of the store, you parked, and Jumpy and Tony went inside the store, that's all you've told us so far.  You said they came back, they had a paper bag, you heard a paper bag, they had it in their lap or something in the backseat and they said get out of here.  Split, make it or something like that, and so far that's all you've told me.  (sic) A  Man, this ain't no good."

We are uncertain as to which part of the tape the defendant's objections are directed, but have chosen the above as the most objectionable in some twelve pages of the taped statements.  It is noted that at the suppression hearing, the defendant, his mother, and a nun testified on behalf of defendant.  Their testimony conflicted with that of the police officers.  The court below resolved those conflicts in favor of admitting the statements into evidence.

■  We find no violation of defendant's rights.  *State v. Kurtz*, 564 S.W.2d 856, 859–860 (Mo. banc 1978); *State v. Phillips*, 563 S.W.2d 47, 54 (Mo. banc 1978), *cert. denied* 443 U.S. 904, 99 S.Ct. 3096, 61 L.Ed.2d 872 (1979).  The trial court found no coercion, trickery, misrepresentation, or promises to induce the defendant to make the statements.  He was not denied an attorney.  He was apprised of his rights from the beginning of his interrogation until the end.  The interrogation was not unduly long.  We rule this point against the defendant.

Finally, the defendant complains about the trial court overruling his motion to exclude the results of a later polygraph examination.  Defendant contends the examination was not run in a manner consistent with acknowledged standards of scientific reliability and was run by an operator who was not qualified as a polygraph expert.

■  As noted above, this was a second polygraph examination.  It was taken after the defendant, by and through his attorney, and the state stipulated in writing that the particular operator would perform the examination.  Under the stipulation, the results of the examinations were to be admitted into evidence.  We find no error in the ruling of the trial court by authority of *State v. Fields*, 434 S.W.2d 507, 512 (Mo. 1968) and *State v. Scott*, 570 S.W.2d 813, 814–815 (Mo.App.1978).

Judgment affirmed.

DOWD, P. J., and REINHARD, J., concur.