**STATE of Missouri, Respondent,**

v.

**John E. BOGGS, Appellant.**

**No. 62271.**

Supreme Court of Missouri,
En Banc.

June 8, 1982.

Rehearing Denied July 6, 1982.

---

Ben K. Upp, Springfield, for appellant.

John Ashcroft, Atty. Gen., Nancy Kelley Baker, Asst. Atty. Gen., Jefferson City, for respondent.

RENDLEN, Judge.

Convicted by a jury of murder first degree (felony murder), § 565.003, RSMo 1978, and sentenced to life imprisonment defendant appeals. Because of the sentence imposed, this Court has exclusive appellate jurisdiction. Art. V, § 3, Mo.Const.

Defendant asserts as error: (1) failure of the trial court to suppress his confessions allegedly obtained in violation of his right to counsel; (2) instructional errors; (3) insufficiency of the evidence to support the first degree murder conviction; and (4) improper denial of his application for change of venue.

In addition to the defendant's confessions, abundant evidence appears in the extensive trial record supporting the jury's verdict of guilt. On Thursday, July 5, 1979, Dr. and Mrs. Larry Dowell and their two sons lived in Strafford, Missouri, and Mrs. Dowell's parents, the Ralph Sharicks, resided in a trailer behind the Dowell home.

That afternoon the Dowell family, with Mrs. Sharick, left for an overnight visit in Kansas City, but because of his arthritic condition, Mr. Sharick remained at home. When the family returned late Friday night, a number of lights were burning in the house and trailer, a screen had been torn from the doorway, the house ransacked, the telephone disconnected and four bullet holes were found in a closet door. Inside the closet Mr. Sharick's body was discovered slumped over in a chair. He had severe lacerations to his scalp and a bullet wound in his chest which caused his death. The chair in which Mr. Sharick was found had been splintered and a broken gun stock was near the body. A number of items including a saxophone, bass guitar, .22 rifle and shotgun were missing.

At approximately 6:30 p. m. on July 6, defendant, accompanied by Robert O'Neal, nicknamed Beaver, was seen in and about Strafford, Missouri, and was readily identified by several witnesses. For several days prior to the murder defendant had been traveling about in southwest Missouri and southeast Kansas where he had picked up his friend, O'Neal. On the evening of July 6, defendant and "Beaver" cruised the Strafford area searching for a suitable house to burglarize. They stopped at one place but refrained from attempting the crime when they saw a young man, Lloyd Hensley, whom they believed might resist. On the pretext of seeking directions, they spoke to Hensley, then left, proceeding in their quest. In passing, they noticed the Dowell residence was a large home and thought it might contain valuable loot. Entering the driveway and parking near the trailer they saw an elderly gentleman, Mr. Sharick, and asked him if anyone could drive them to town as their car was not running well. Unfortunately, Mr. Sharick replied that no one would be home until midnight, whereupon defendant and O'Neal made known their criminal intent. Apparently hoping they would leave, Mr. Sharick "offered" the contents of his wallet, but this did not deter their design. With Mr. Sharick in tow, the intruders searched the

trailer, garage and main house, gathering loot which included a twelve gauge shotgun, some .22 shells, a rifle, bass guitar and saxophone. During this process the men tore the telephone from the wall. In his confessions defendant claimed they had planned to bind Mr. Sharick but because of his age and physical condition, placed him instead in a chair in the closet and closed the door. Defendant further maintained they had repeatedly assured Mr. Sharick he would not be harmed. About that time defendant went into another part of the house, but hearing three shots returned to discover O'Neal had shot the telephone. Resuming his search of the house defendant heard three more shots and ran to the room in which Mr. Sharick was closeted, where he saw O'Neal striking Mr. Sharick with what appeared to be a rifle.[1] In a brief struggle with O'Neal, during which defendant took the rifle from him, the closet door shut and defendant saw it was riddled with bullet holes. O'Neal then drew a pistol from his belt, which defendant stated he had not previously seen, and menaced defendant, but apparently tempers cooled. They decided to leave the premises, but before going, defendant opened the closet door and saw that Mr. Sharick was dead. Leaving the scene of the crimes, the men drove to a truck stop where they sold the two guns stolen from the Dowell residence, as well as other items, to witnesses who later positively identified both men. The purchasers subsequently learned of the crimes and became suspicious of the items they had bought. This led to contact with the local law enforcement officers and disclosure of defendant's name. Defendant and O'Neal were traced to Texas where defendant was arrested on Sunday, July 8th.

## I.

Defendant first contends the trial court erred by not suppressing the confessions which he argues were obtained in violation of his right to counsel.[2] After an extensive evidentiary hearing, at which abundant evidence supportive of the trial court's ruling was adduced, defendant's motion to suppress was overruled.

Captain Charles Whitlow[3] of the Greene County Sheriff's Department, whose testimony with two other State's witnesses comprised the greater part of the suppression hearing evidence, was the officer in charge of the Sharick murder investigation. Because of the broad trail left by the suspects, defendant's and O'Neal's names soon surfaced. By July 8, charges of capital murder, burglary and armed criminal action were filed against defendant and, alerted that defendant was at a Fort Worth, Texas bus station, Whitlow phoned the Fort Worth police who detained defendant there. Captain Whitlow flew to Fort Worth, arriving about noon on Sunday, July 8th, met defendant and advised him he wished defendant to return to face a murder charge in Greene County. Defendant waived extradition. During the return flight Whitlow did not question defendant, and indeed, when he attempted to talk, Whitlow requested he wait. Defendant was incarcerated the night of July 8th in the Greene County Jail, and at no time on July 8 did he ask to use the telephone or request counsel.

On the morning of July 9, 1979, Whitlow took defendant from the Jail to the Sheriff's office where he was given the *Miranda* warnings and advised of his constitutional

---

1. Defendant's tale differed from his conspirator's version found in *State v. O'Neal*, 618 S.W.2d 31, 34, 36–37 (Mo.1981). According to O'Neal, defendant was the triggerman, coercing O'Neal.

2. At trial, defendant asserted that promises of leniency (assurances that he would be charged with burglary only) rendered his confessions involuntary and further, induced the waivers of his right to counsel. These assertions were abandoned and defendant's point and argument on appeal center on want of effective waiver of his right to counsel.

3. Whitlow's testimony was augmented by Detective Danny Lowe of the Greene County Sheriff's Department and Cathy Henry, a court reporter who transcribed defendant's July 9th statement. The defense witnesses, pertinent to the denial of counsel allegation, consisted of defendant and Judge Davidson, who presided at defendant's appearance on the morning of July 9.

rights. He then asked to speak to an attorney. Whitlow asked if he had an attorney in mind and defendant pulled a yellow piece of paper from his pocket which apparently bore attorney Bert Twibell's name, for defendant asked Whitlow for Twibell's telephone number. When it was provided the officers left the room and as they were leaving, defendant was dialing. The officers returned about 15 minutes later and defendant told them Twibell had indicated it would be permissible for defendant to give a statement, but that defendant should "tell the truth".[4]

Defendant was then taken to the courthouse by the officers, at approximately 9:30 a. m., for appearance before the Associate Circuit Judge who informed defendant of the capital murder, burglary and armed criminal action charges against him, and inquired whether defendant wanted an attorney appointed or would hire private counsel. Captain Whitlow, who was standing next to defendant, leaned over and whispered something to defendant. Judge Davidson was unable to hear the remark, but Detective Lowe, who was standing behind the two, testified Whitlow asked defendant, who was swaying and appearing ill, if he wanted to sit down, to which defendant nodded yes and took a seat. It was then indicated to the Court, either by Captain Whitlow, accompanied by defendant's affirmative nod, or defendant himself, that defendant would investigate hiring counsel. Defendant did *not* tell Judge Davidson that he needed an attorney. The

4. The testimony of Captain Whitlow in this particular was:

Q. Before you left the room did you see Johnny Boggs dial the number?
A. Yes.
Q. Do you know whether or not he spoke with anybody?
A. Personally, no, only what he told me.
Q. All right. How much time passed before you re-entered the room?
A. Probably ten to fifteen minutes.
Q. What, if anything, did the defendant, Johnny Boggs, tell you when you re-entered the room?
A. I asked him what he had been advised and he said that Mr. Twibell had told him that if that's what he wanted to do that as far as he was concerned it was okay to go ahead.
Q. To go ahead with what?
A. And give the deposition.
Q. That's what the defendant, John Boggs, said?
A. Yes, that's what he told me, yes.

Detective Lowe testified concerning these matters as follows:

Q. Prior to the time that questions were asked did he make any request that he be allowed to talk to an attorney?
A. Yes, he did.
Q. And what did he say to you?
A. He did not say it directly to me, he informed Captain Whitlow that he would like to talk to an attorney first. Captain Whitlow stated, "Fine, have you got one you want to call?" He had a piece of paper which he pulled out and said, "Yes, Bert Twibell".
Q. All right. Was he—what happened after that? Was he allowed to use a telephone?
A. He used the phone in Captain Whitlow's office and Captain Whitlow told him that we'd leave him alone to talk to the attorney if he so desired and he said, "Yes,

I'd like to do that", and all of the officers—all of the people that were present did leave the room.
Q. Was he then inside the room by himself?
A. Yes, he was.
Q. Do you know whether or not he made a call?
A. He was dialing the phone when I left.
Q. All right. How much time passed before you re-entered the room?
A. Oh, fifteen, twenty minutes, approximately.
Q. When you re-entered the room did the defendant indicate whether or not he had contacted an attorney?
A. Yes.
Q. And what, exactly, did he say?
A. He stated to Captain Whitlow that Mr. Twibell had informed him that if he was going to give a statement or deposition to make sure he gave it correctly and tell the truth.

Though attorney Twibell was never subpoenaed to testify in this suppression hearing, it was conceded during oral argument to this Court that Bert Twibell, who is associated with defense counsel, Ben Upp, did receive a telephone call from defendant *at some time.*

Defendant's contrary testimony was that he was taken immediately from the courthouse to the jail and on the way told Whitlow he needed an attorney but could not afford one. Defendant claims Whitlow told him he would get one "in due time". He also denied having made a phone call and said he had never heard of Bert Twibell at that time (prior to his court appearance). However, he admitted talking with a lawyer after the appearance before the Associate Circuit Judge.

Court finally instructed defendant to advise the court by a "certain date" the name of the attorney he had selected.[5] Defendant was returned to the Sheriff's Department and there gave his statement.

At approximately 10:00 a. m. on July 9, 1979, at the Greene County Sheriff's Department, defendant was advised again of his rights and shown a "rights form", which he assisted the officers in completing. Captain Whitlow again read a rights waiver to defendant, and defendant then read the form aloud. Defendant stated that he understood his rights, signed the waiver and gave a statement, witnessed by Captain Whitlow, Detectives Jack McMullin and Danny Lowe, and Cathy Henry, a stenographer who transcribed the statement. In the statement, defendant further acknowledged that he was charged with murder, that he knew and waived his rights, and that his statement was completely voluntary. At conclusion of the statement, defendant suggested visiting the scene of the crime, feeling it would help revive his memory.

Accordingly, Whitlow contacted the prosecuting attorney and arranged for a camera crew to accompany them on July 10, 1979. Before and after arriving at the scene for the videotaping, defendant was again given the *Miranda* warnings, which were read aloud to him and which he read to himself. Additionally, a second form advised defendant of his rights respecting visiting the scene and videotaping the reenactment. Defendant stated he understood all of these rights and again made his waiver. Defendant's videotaped reenactment of the events of July 6, 1979, was the same, in substance, as the acts described in the written statement taken the previous day. The videotape also depicts defendant being advised, then waiving his constitutional protections.[6]

The officers testified no promises or threats were made to defendant prior to either statement, defendant was never told he would be prosecuted for burglary only, and to the contrary, he was advised the officers could promise nothing.

About four days after the July 9th statement, Captain Whitlow encountered Bert Twibell in the jail, and upon inquiry, Twibell said that he would not represent defendant because defendant was unable to afford his services. Several days later, defendant sent Whitlow a note stating he wanted to speak to him. In their discussion, defendant informed Whitlow he could not afford Twibell and asked Whitlow to obtain court appointed counsel. This information was relayed to the prosecuting attorney and upon request, the trial court appointed attorney Louren Honecker on July 16, 1979. On July 30, 1979, with counsel's knowledge, defendant signed the transcribed statement given three weeks earlier on July 9.

Because defendant invoked his right to counsel, the question is whether he thereafter waived the requirement for counsel's presence at any interrogation.

 The invocation of an accused's right to counsel[7] does not necessarily vitiate a subsequent confession made in the absence of counsel. *State v. Chandler,* 605

---

5. The testimony of Associate Circuit Judge testifying for defendant described it this way:

> Q. Did you set a date—or does the Court file reflect that you set a date that Mr. Boggs was to get back with you to tell you whether or not he was going to hire an attorney?
> A. Yes, as reflected on the docket sheet, that date is set out on the docket sheet.
> Q. So you did advise Mr. Boggs that if he had not hired an attorney by whatever date is reflected in the file, that he was to come back?
> A. I believe I instructed him that he was to to let me know by a certain date who his attorney was, what attorney he had selected, if I remember correctly.

> Q. And that date would be in the court file on your docket sheet?
> A. Yes, I'm quite sure it would.

6. During the suppression hearing, a portion of the videotape was played, enabling the court to observe defendant's demeanor and assist in determining the issue of voluntariness.

7. A *Fifth Amendment* right to counsel's presence arises during interrogation. The *Sixth Amendment* right attaches after indictment or information, or the commencement of adversary criminal proceedings. *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 1882 n. 7, 1884 n. 8, 68 L.Ed.2d 378 (1981).

S.W.2d 100, 113 (Mo. banc 1980); *State v. Clark*, 592 S.W.2d 709, 716 (Mo. banc 1979), *cert. denied*, 449 U.S. 847, 101 S.Ct. 132, 66 L.Ed.2d 57 (1980); *State v. Davis*, 582 S.W.2d 342, 346 (Mo.App.1979). To prove waiver, the State must show "an intentional relinquishment or abandonment of a known right or privilege." *Brewer v. Williams*, 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977). Additionally, when the accused has expressed his desire to deal with the police only through counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981); *State v. Oldham*, 618 S.W.2d 647 (Mo. banc 1981).

■ In reviewing the trial court's determination on the motion to suppress, the weight of the evidence and credibility of witnesses are questions for the trial court's resolution. *State v. Hahn*, 618 S.W.2d 435 (Mo.1981); *State v. Chandler*, 605 S.W.2d 100, 117 (Mo. banc 1980); *State v. Olinghouse*, 605 S.W.2d 58, 66 (Mo. banc 1980); *State v. Clark*, 592 S.W.2d 709, 716 (Mo. banc 1979), *cert. denied*, 449 U.S. 847, 101 S.Ct. 132, 66 L.Ed.2d 57 (1980), incorporating *State v. Clark*, 552 S.W.2d 256, 263 (Mo.App.1977); *State v. Phillips*, 563 S.W.2d 47, 53–54 (Mo. banc 1978), *cert. denied*, 443 U.S. 904, 99 S.Ct. 3096, 61 L.Ed.2d 872 (1979); *State v. Rapheld*, 587 S.W.2d 881, 885–86 (Mo.App.1979). In this vein, as an appellate court, we are not confined to defendant's version of the facts; *State v. Johnson*, 618 S.W.2d 191 (Mo.1981); *Olinghouse, supra* at 66; we are to affirm if the judgment is supported by substantial evidence. *Chandler, supra* at 117. Supportive of the two officers' testimony showing valid waiver are defendant's repeated expressions of willingness to make statements in the absence of counsel, manifested by the fact defendant signed several waiver forms after being advised of his rights, his numerous oral and written waivers following the repeated *Miranda* warnings, and the fact he gave two detailed consistent confessions.

*Chandler, supra* at 115; *see also, North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979); *Phillips, supra; Rapheld, supra*. There was ample evidence that defendant knowingly, intelligently and voluntarily waived his right to counsel at the time he gave each statement. *Chandler, supra* at 117.

■ Further, accepting the State's version of the events in accordance with the above principles, we are presented with a situation clearly different from that which compelled a conclusion of inadmissibility in *Edwards v. Arizona, supra*. There, defendant invoked his right to counsel and was returned to the jail. Detectives arrived the next morning to talk with defendant, and though defendant told the jailer he wished to remain silent, he was informed that he had to see the police. After the police again advised him of his rights, defendant agreed to make a statement. The operative facts rendering this statement inadmissible were (1) no opportunity to contact counsel, and (2) the police initiated interrogation after he invoked his rights. In the case *sub judice*, when defendant requested opportunity to consult with lawyer Twibell, the police supplied the attorney's phone number and retired from the room for about 15 minutes while defendant placed a telephone call for that purpose. When they returned defendant said the attorney told him he *could* make a statement but he *should* tell the truth. Hence, the trial court could have found that not only was counsel made available and defendant's request honored, but defendant voluntarily initiated further discussions, then knowingly and intelligently relinquished his rights and voluntarily gave a statement. Defendant's contention is denied.

## II.

■ Defendant next asserts evidential insufficiency and instructional errors which will be discussed individually below. These claims are premised on the fallacious notion that the new Criminal Code, effective January 1, 1979, added as an additional element

to the offense of felony murder (where the State relies on the theory that defendant is responsible for the conduct of another) that defendant *knew* his co-felon was *practically certain* to commit the murder. Addressed and determined adversely to defendant's contention in *State v. O'Neal*, 618 S.W.2d 31, 38–39 (Mo.1981), this allegation merits little further discussion. Suffice to say, the law, respecting liability of an accomplice for a killing perpetrated by the principal actor during a felony, remains unchanged. If the accomplice has the requisite intent to commit or participate in the predicate felony (burglary here), no other mental state on his part need be proved as the felony murder rule imposes strict liability. *State v. Olds*, 603 S.W.2d 501, 509 (Mo. banc 1980); *State v. Handley*, 585 S.W.2d 458, 461–64 (Mo. banc 1979); *State v. Moore*, 580 S.W.2d 747, 751–52 (Mo. banc 1979); *State v. Williams*, 529 S.W.2d 883 (Mo. banc 1975); *State v. Rollie*, 585 S.W.2d 78, 81–82, 90 (Mo.App.1979); *State v. Parcel*, 546 S.W.2d 571, 574 (Mo.App.1977).

 The first three claims (hereinafter A, B & C) of instructional error rest on defendant's mistaken assumption that the law requires a finding that defendant knew "Beaver" O'Neal was practically certain to commit murder.

### A.

On this erroneous assumption he first complains that Instruction No. 5 (MAI–CR2d 2.10 modified) erroneously included the following requirement that,

A person is also criminally responsible for a homicide committed by himself or another person if the homicide occurred in committing and in the course and furtherance of the particular offense they initially contemplated.

This modification of the second paragraph of the instruction was correct in this first degree murder case under the rationale explicated in *State v. O'Neal, supra* at 38–39. The contention is without merit.

### B.

Defendant launches essentially the same attack on the main verdict director, Instruction No. 6, which is a syntheses of MAI–CR2d 15.06 modified by 2.12. He argues that the instruction as given erroneously omitted the fifth paragraph of the approved instruction 2.12 which states:

Fifth, that the defendant knew such other (person was) (persons were) practically certain to (commit) (attempt to commit) (commit or attempt to commit) such additional offense.

This modification of the approved instruction was proper because "Paragraph Fifth of MAI–CR2d 2.12 should be deleted when the instruction is used to submit first degree murder." *State v. O'Neal, supra* at 39.

### C.

Similarly defendant's third claim of instructional error stems from the trial court's refusal to give his proffered converse Instruction C, which stated:

If you do not find and believe from the evidence beyond a reasonable doubt that the defendant John E. Boggs knew Robert O'Neal was practically certain to shoot Ralph Roscoe Sharick, you must find the defendant John E. Boggs not guilty of murder in the first degree.

This instruction, adapted from MAI–CR2d 3.02, does not properly state the law as to murder first degree, for as discussed above, a defendant may be accountable for murder first degree though he had no knowledge his co-felon was practically certain to kill the victim. Hence, this contention too must be denied, for a proffered "converse must correctly declare the law" before its refusal constitutes error. *State v. White*, 622 S.W.2d 939, 946 (Mo. banc 1981).

### D.

 Defendant's last two assertions of instructional error center on application of § 562.051, which deals with convictions of different degrees of offenses. He first contends the main verdict director (Instruction No. 6) was fatally deficient because it instructed that if the jury found the elements

itemized in paragraphs 1 through 4, it *"will find the defendant guilty of murder in the first degree."* (Emphasis added). Defendant maintains that employing the term "will" was contrary to the Note on Use 3, MAI–CR2d 2.12, and prejudicial because it precluded the jury's consideration of manslaughter. Note on Use 3 provides "[t]he word 'may' must be used in the phrase 'then you (will) (may) find the defendant guilty, etc.' in any case where Section 562.051 is applicable. See Note 3 under MAI–CR 2.14." The referenced Note 3 of MAI–CR2d 2.14 describes *when* § 562.051 (and by reference, MAI–CR2d 2.14 and the word "may" in MAI–CR2d 2.12) apply. Section 562.051 directs:

> *Except as otherwise provided*, when two or more persons are criminally responsible for an offense which is divided into degrees, each person is guilty of such degree as is compatible *with his own culpable mental state* and with his own accountability for an aggravating or mitigating fact or circumstance. (Emphasis added).

Exceptions are carved from § 562.051 in § 562.026, which dispenses with the requirement of a culpable mental state in subsection 2, when the

> statute defining the offense clearly indicates a purpose to dispense with the requirement of any culpable mental state as to a specific element of the offense.

Section 565.003 indicates such a purpose, by prescribing that:

> Any person who unlawfully kills another human being *without a premeditated intent* to cause the death of a particular individual is guilty of the offense of first degree murder if the killing was committed in the perpetration of . . . [one of five enumerated felonies]. (Emphasis added).

*See, State v. O'Neal*, 618 S.W.2d 31, 38 (Mo.1981). Hence, as no culpable mental state respecting the killing is required for first degree murder and any instruction thereon, § 562.051 does not apply and use of the word "will" is not error. *See, O'Neal, supra.*

In any event, even if Instruction No. 6 deviated from the Notes on Use under MAI–CR2d 2.12, its prejudicial effect is to be judicially determined. Rule 28.02(e); *State v. White*, 622 S.W.2d 939, 943 (Mo. banc 1981); *State v. Graves*, 588 S.W.2d 495, 497–98 (Mo. banc 1979); *State v. Boyington*, 544 S.W.2d 300, 303–04 (Mo.App. 1976). The failure to instruct as required is not prejudicial when, by reading all instructions together, the jury was clearly apprised of the available options. *White, supra; State v. Arrington*, 559 S.W.2d 749, 750 (Mo. banc 1978), *vacated on other grounds, Lee v. Missouri*, 439 U.S. 461, 99 S.Ct. 710, 58 L.Ed.2d 736 (1979); *Boyington, supra* at 304. Such is the case here. Separate verdict directing instructions were given on murder in the first degree and manslaughter. Instruction No. 7 directed consideration of manslaughter if the jury acquitted of murder first degree as submitted in Instruction No. 6. Each verdict director carried a tail ordering acquittal if all of the foregoing elements were not found beyond a reasonable doubt. Further, the verdict form entitled the jury to find defendant guilty of murder in the first degree, guilty of manslaughter, or not guilty at all. Hence, the jury was provided every opportunity to find defendant guilty or not guilty of each offense, and separate consideration of each offense was accomplished beyond possibility of doubt. Accordingly, there could have been no prejudice to defendant warranting reversal. *Arrington, supra.*

## E.

Defendant's final allegation of instructional impropriety lies in the trial court's failure to give MAI–CR2d 2.14, which directs:

> In this case you will be instructed that (under Count _____) you may find the defendant either not guilty of any offense or guilty of either [*insert names of offenses, such as "burglary in the first degree or burglary in the second degree" or "capital murder or second degree murder or manslaughter"*]. In that connection you are instructed that when (two) (two or more) persons are criminally re-

sponsible for an offense which is divided into (degrees) (greater and lesser offenses), each such person is guilty of that (degree) (offense, greater or lesser,) which is compatible with that state of mind with which he acted in (committing) (attempting to commit) (committing or attempting to commit) the offense (and compatible with his own accountability for any (aggravating) (mitigating) (aggravating or mitigating) fact or circumstance).

Note on Use 3 of MAI–CR2d 2.14 provides:
3. This instruction must be given, requested or not, "except as otherwise provided, when two or more persons are criminally responsible for an offense divided into degrees," and an offense is so submitted that the jury may find the defendant guilty of any one of two or more "degrees" thereof. See Section 562.051. An offense is divided into "degrees" either where the statutes (as in the cases of burglary or tampering) use the word "degree" in defining an offense, or where one offense is included in another within the meaning of Section 556.046. Thus, manslaughter for the purpose of this instruction may be considered as a "degree" of murder . . . .

Accordingly, whether MAI–CR2d 2.14 must be given, turns on the applicability of § 562.051. As discussed above, § 565.003, in dispensing with the requirement of a culpable mental state for first degree murder, renders § 562.051 extraneous. Hence, failure to submit MAI–CR2d 2.14 was not error. *See, O'Neal, supra.*

Again, however, if omission of MAI–CR2d 2.14 were error, to rise to a level requiring reversal, such error must have been prejudicial, which remains for judicial determination. *State v. White, supra; State v. Graves, supra*; and *State v. Boyington, supra.* Defendant alleges the omission of MAI–CR2d 2.14 prejudiced him be-

cause, like use of the word "will", it precluded consideration of manslaughter by the jury. However, to reiterate, the State's verdict directors (Nos. 6 and 7), their respective "tails", together with the verdict form employed, clearly informed the jury that it might convict of murder in the first degree or manslaughter, or acquit of both charges, depending on the facts found. Accordingly, want of prejudice would also mandate denial of this contention.

### F.

Finally defendant claims the evidence was insufficient to support his conviction for first degree murder, and in so doing again misconstrues the felony murder doctrine. Defendant may *not* have known O'Neal was practically certain to shoot Mr. Sharick, and yet defendant's guilty verdict may be sustained. Liability for felony murder attached when Mr. Sharick was killed in the perpetration of defendant's and O'Neal's burglary of the Dowell residence.

Hence, viewing the evidence in the light most favorable to the State, *State v. Turner*, 623 S.W.2d 4, 6 (Mo. banc 1981), the proof, as set forth initially in this opinion, was clearly sufficient to sustain the jury's finding that defendant, with the purpose of promoting its commission, aided O'Neal in committing the offense of second degree burglary, in the course and furtherance of which, one of them caused the death of Mr. Sharick by shooting him, as these facts were submitted by the instructions.

### III.

Defendant finally charges error in the trial court's denial of his motion for change of venue grounded on excessive pretrial publicity. Section 545.490, prescribing the procedure for seeking a change of venue,[8] provides that upon filing by defendant

---

**8.** Defendant filed his application for change of venue on February 1, 1980. Rule 32 governing change of venue (adopted June 13, 1979) had been suspended effective November 21, 1979, until further notice. Accordingly, on February 1, 1980, no Rule prescribed the procedure for seeking change of venue. Rule 19.04 provides that "[i]f no procedure is specially provided by rule, the court having jurisdiction shall proceed in a manner consistent with judicial decisions or applicable statutes." Section 545.490, RSMo 1978, the applicable statute, is substan-

of the required petition, "the truth of the allegations thereof shall be proved, to the satisfaction of the court, by legal and competent evidence, and the prosecuting attorney may in such case offer evidence in rebuttal of that submitted in support of such application." In support of his application, at the hearing, defendant introduced scripts from two local television news broadcasts and clippings from local newspapers, relating to publicity surrounding this crime. Additionally, defendant called two witnesses, who testified in substance that the case had received extensive media coverage in the Springfield area and because of this publicity it would be difficult for either to render a fair and impartial decision. The second witness admitted a two year acquaintance with defense counsel who requested he testify regarding defendant's murder trial. In rebuttal, the State presented four Springfield area witnesses, none of whom was aware why he or she had been summoned to testify. Though two witnesses acknowledged slight familiarity with a few facts surrounding the crime, all four testified they had not formed opinions respecting the case and could probably sit as impartial jurors. At the conclusion of this evidence, the trial court overruled defendant's application.

 When the statutory procedures are followed, as occurred here, the decision to grant or deny a change of venue rests within the trial court's discretion, and that ruling is not to be disturbed unless an abuse of discretion is demonstrated. *State v. Odom,* 369 S.W.2d 173, 180 (Mo. banc 1963), *cert. denied,* 375 U.S. 993, 84 S.Ct. 634, 11 L.Ed.2d 479 (1964); *State v. Zinn,* 562 S.W.2d 784, 788 (Mo.App.1978); *State v. Parcel,* 546 S.W.2d 571, 575 (Mo.App.1977). We can find no such abuse here.

The judgment is affirmed.

tially similar in pertinent part to Rule 30.01 (1979), governing changes of venue prior to Rule 32.

Greene County, where this cause was pending, is a county of more than 75,000 inhabitants, and the statute requires an application for change of venue be supported by the affidavit of at least two credible disinterested citizens of

DONNELLY, C. J., and WELLIVER, MORGAN and HIGGINS, JJ., concur.

SEILER and BARDGETT, JJ., dissent in separate dissenting opinions filed.

BARDGETT, Judge, dissenting.

I respectfully dissent. The principal opinion proceeds on the premise that *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), applies to this case. If it does, I believe Boggs' confessions were obtained by the police in violation of his fifth amendment right to counsel and should have been suppressed under *Edwards,* and even if *Edwards* does not apply the defendant's sixth amendment right to counsel was violated.

All events surrounding Boggs's confessions occurred in July 1979 and the trial was completed in April/May 1980. The *Edwards* decision, however, was not handed down until May 18, 1981. It is at least questionable whether Boggs' waiver of his rights and confessions are required to be evaluated in light of *Edwards.* I am not satisfied that *Edwards* must be given retroactive effect. *See, e.g., Williams v. United States,* 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971); *Johnson v. New Jersey,* 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966); *Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965); *Martin v. Wyrick,* 568 F.2d 583 (8th Cir.), *cert. denied,* 435 U.S. 975, 98 S.Ct. 1623, 56 L.Ed.2d 69 (1978). *Cf. Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) (criteria to determine if decision should be applied retroactively). Nevertheless, the principal opinion applies *Edwards* to this case and then finds no violation of its principles.[1] If *Edwards* applies, I be-

the county. No change of venue lies as a matter of right.

1. The principal opinion states that "the trial court *could have found* that not only was counsel made available and defendant's request [for counsel] honored, but defendant voluntarily initiated further discussions, then knowingly and intelligently relinquished his rights and voluntarily gave a statement." At 453 (emphasis

lieve its requirements were ignored and violated by the state.

A brief summary of the facts is necessary. On July 8, 1979, a felony complaint charging capital murder, burglary, and armed criminal action was filed against Boggs by a Greene County assistant prosecuting attorney. A warrant for his arrest issued. Captain Whitlow then flew to Fort Worth, Texas, and returned Boggs to Missouri after he had waived extradition. Boggs spent that night in the Greene County jail.

On July 9, 1979, the sequence of events becomes muddled. But, accepting the principal opinion's use of the officer's testimony as accurate, several things are clear. On the morning of the 9th, Boggs was taken from the jail to the sheriff's office. There, he was read his *Miranda* rights and the waiver form. Prior to the time the rights waiver was filled out and before any questioning began, "[Boggs] stated he would like to talk to his attorney before he gave a deposition." Testimony of Captain Whitlow.[2] He was given that opportunity. *After* he spoke with the attorney the police returned to the room. *When Captain Whit-*

*low asked Boggs "what he had been advised",* Boggs either stated "that Mr. Twibell had told him that if that's what he wanted to do [give a deposition] that as far as he [Twibell] was concerned it was okay to go ahead"[3] or "if he was going to give a statement or deposition to make sure he gave it correctly and tell the truth."[4]

Prior to questioning, Boggs was again advised of his rights and read the waiver form. At some point, either before the signing of the waiver form and questioning or after the signing of the waiver form and during the questioning, Boggs was taken to the courthouse for his initial hearing.[5] At that hearing the charges were read. The judge testified that he did not advise Boggs of his right to have counsel appointed.[6] Nonetheless he asked Boggs what he had done about an attorney. Boggs, by some means, expressed his desire to hire an attorney. The judge remembered the event as follows:

A. Well, as I recall I set the bond and the date for the preliminary examination and then asked him what he was going to do with respect to an attorney.

Detective Lowe testified that Boggs was taken to the court "from the Sheriff's office." When he was later pressed for an exact sequence of events, the following transpired:

Q Okay. You accompanied John from the Greene County Jail up to the Court, and then he was taken to the—to Captain Whitlow's office. Isn't that a correct statement, sir?

A I don't know if that's correct, or not, sir.

Q And do you recall the sequence of events that day?

A Outside of the statement, no sir.

Q Do you know—

A —I don't know, exactly, what sequence they fell into. I don't know if he was taken to Captain Whitlow's office first, or to the Court first.

6. On cross-examination by the state the judge stated:

Well, I just asked him what he was going to do about an attorney and then at that point, as I've testified, it was said that he was going to employ his own attorney, but I did not advise him then that if he couldn't afford an attorney I would appoint one for him.

---

added). While the trial court *could have made* all these findings, it seems unlikely. When the suppression hearing was held in February 1980, *Edwards* had not yet been decided.

2. Detective Lowe also related that prior to the time any questions were asked, Boggs requested to speak with an attorney. In fact, Detective Lowe stated that after the *Miranda* rights and waiver form were read and explained to Boggs, "he said he would like to call an attorney and talk to him before he went any further."

3. Testimony of Captain Whitlow.

4. Testimony of Detective Lowe.

5. Captain Whitlow testified that "either while we were taking the statement or deposition or just prior to starting it the Court called for him to be brought over and arraigned. We did bring him over and arraign him." Later Captain Whitlow apparently was certain that "[w]e had started the deposition at the time they called for him to be arraigned, so we stopped, and broke until he was brought in and arraigned, and then we went back and completed it."

Q. Could you tell us, sir, what occurred at that time?

A. Well, Charles Whitlow turned to him and whispered something to him and then turned back and my best recollection is that Mr. Whitlow said he was going to employ his own attorney and as I recall Mr. Boggs in some way indicated that that was correct by nodding or otherwise, some expression. I don't recall Mr. Boggs saying anything at that point.

Captain Whitlow believed that "Mr. Boggs stated that he wished to look into hiring his own attorney first." Detective Lowe, although not remembering the exact words, did recollect Boggs "saying something about he was going to try to get Bert Twibell to represent him." On completion of the hearing "Mr. Whitlow said at that point that he [Boggs] was to go back to the Sheriff's Department for further questioning," and Boggs then gave or completed his confession. Testimony of Judge Davidson.

The fifth amendment right to counsel under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), protects a suspect's privilege against compulsory self-incrimination during custodial interrogation. The United States Supreme Court recently recognized that "additional safeguards are necessary when the accused asks for counsel." *Edwards v. Arizona, supra,* 451 U.S. at 484, 101 S.Ct. at 1884. To that end, the Court adopted a prophylactic rule setting forth objective criteria by which to evaluate the waiver of counsel. Once a suspect invokes his right to counsel, he is not subject to "further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484–85, 101 S.Ct. at 1884–85. And any subsequent finding of a valid waiver must include "the necessary fact that the accused, not the police, reopened the dialogue with the authorities." *Id.* at 486 n.9, 101 S.Ct. at 1885–86 n.9. Therefore, after a suspect has invoked his fifth amendment right to counsel, the waiver of that right during custodial interrogation must be judged by objective criteria. Without counsel present, the suspect must have initiated the conversation.[7] If he did initiate the dialogue, then the purported waiver must be shown to be knowing and intelligent (intentional relinquishment or abandonment of a known right or privilege) under the totality of the circumstances. *Id.*

The facts of the instant case fail that test. Here, the record is bereft of any evidence that Boggs, after asserting his right to counsel *twice*, initiated "further communication, exchanges, or conversations with the police." In fact, the evidence affirmatively shows that the police initiated all contacts and communications.

After requesting that he wanted counsel before any interrogation and after speaking with an attorney, *Captain Whitlow asked* Boggs what his attorney said. Boggs *replied* by saying, in essence, that his attorney told him if he wanted to give a statement to tell the truth. By any account, Boggs never said that he wanted to give a statement nor could his reply to Captain Whitlow constitute an initiation of conversation with the police. First, he only responded to the questioning of the police. Second, his reply could not be termed an initiation of communication because there is no indication that Boggs changed his mind about seeing an attorney before speaking with the

---

7. The United States Supreme Court recognized that "[t]he Fifth Amendment right identified in *Miranda* is the right to have counsel present at any custodial interrogation." *Edwards,* 451 U.S. at 485–86, 101 S.Ct. at 1885. In fact, "*Miranda* itself indicated that the assertion of the right to counsel was a significant event and that once exercised by the accused 'the interro-gation must cease until an attorney is present.' 384 U.S., at 474 [86 S.Ct., at 1628]. Our later cases have not abandoned that view." 451 U.S. at 485, 101 S.Ct. at 1885. *See also id.* at 482, 101 S.Ct. at 1883. The *Edwards* Court, however, did not prevent a suspect from confessing without counsel present once he asserts

police.[8] Thereafter, Boggs was either questioned or taken to court for his initial hearing.

In court Boggs, by whatever means, again asserted his right to counsel. The police, present in court and aware of Boggs' assertion of his right to counsel, immediately left the court after the hearing and returned to Captain Whitlow's office because Boggs "was to go back to the Sheriff's Department for further questioning." There, the questioning either began or continued[9] at the insistence and instigation of the police.

The principal opinion finds that some evidence

> showing ... [a] valid waiver ... [were] defendant's repeated expressions of willingness to make statements in the absence of counsel, manifested by the fact defendant signed several waiver forms after being advised of his rights, his repeated oral and written waivers following the repeated *Miranda* warnings, and the fact he gave two detailed consistent confessions.

At 452–453. The Supreme Court held, however, that "a valid waiver of that right [to counsel] cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights," 451 U.S. at 484, 101 S.Ct. at 1884 (footnote omitted), especially without "the necessary fact that the accused, not the police, reopened the dialogue with the authorities." *Id.* at 486 n.9, 101 S.Ct. at 1885–86 n.9. Simply, each time after Boggs asserted his right to counsel the evidence of who initiated further contact or communication demonstrates that it was the state, not the appellant, who did so.

As stated at the outset, I doubt that *Edwards* should be given retroactive effect. Its principles probably should not apply to statements or confessions taken prior to *Edwards* even though they are offered in evidence at a trial after *Edwards*. *Johnson v. New Jersey, supra.* The reason the foregoing portions of this dissent were written is because the principal opinion applies *Edwards* to this case and states that the criteria of *Edwards* were satisfied. In my opinion, the criteria of *Edwards* were violated and, therefore, if *Edwards* applies, there was no valid waiver of Boggs' fifth amendment right to counsel.

Additionally, it is my opinion that appellant's sixth amendment right to counsel was violated. Adversary criminal proceedings had begun, at the latest, when Boggs was brought before the court for his initial appearance, after his arrest by warrant and the filing of a criminal complaint, and the sixth amendment right to counsel would have attached at that time. The state agrees, stating in its brief, "[A]t the time in question appellant was entitled to the help of an attorney." *See Brewer v. Williams,* 430 U.S. 387, 399, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977). And the sixth amendment right to counsel is a broad guarantee that the accused "need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." *United States v. Wade,* 388 U.S. 218, 226, 87 S.Ct. 1926, 1932, 18 L.Ed.2d 1149 (1967). Yet, without the presence of an attorney, the police chartered a course by which to obtain a confession from Boggs at a critical stage of the proceedings.

Where the state deliberately elicits incriminating statements from an accused when counsel is not present, it has inter-

---

that right, if he decides to relinquish his right and initiate the dialogue with the authorities.

**8.** Although the Supreme Court in *Edwards* never explained what would constitute suspect-initiated dialogue, it seems clear that the suspect must speak first to the authorities with the purpose of not dealing with them through an attorney. To allow any conversation or con-

tact, no matter what the content, to constitute suspect-initiated dialogue would emasculate the "additional safeguards ... necessary when the accused asks for counsel." Not even the fifth amendment right to silence is so strictly construed.

**9.** *See* n.5 *supra.*

fered with his right to counsel and violated his sixth amendment right, absent waiver. No doubt the police deliberately elicited the confessions. The court reporter who recorded the confession on July 9th had been contacted the day before (prior to the time Boggs had even been returned to Missouri) to be at the sheriff's office that morning. And after his initial court appearance, Boggs was taken to the sheriff's office for the express purpose of "further questioning". The officers intentionally created a situation that was likely to induce incriminating statements by Boggs. *See United States v. Henry*, 447 U.S. 264, 274, 100 S.Ct. 2183, 2188, 65 L.Ed.2d 115 (1980). Without waiver, Boggs' sixth amendment right to counsel was violated. The principal opinion, however, finds that Boggs validly waived his right to counsel. Although the principal opinion fails to make clear whether it is evaluating that waiver in terms of the fifth or sixth amendment,[10] reliance on *Edwards* suggests that it proceeded under the fifth amendment because *Edwards* was a fifth amendment case. Nevertheless, even if there was a showing that the state did not violate Boggs's fifth amendment right to counsel, it is insufficient to prove the lack of a sixth amendment violation.

Once adversary proceedings begin against an individual, he has the right to an attorney whenever the state conducts an interrogation. *Brewer, supra*, 430 U.S. at 401, 97 S.Ct. at 1240. And as the state admits in its brief, "In determining whether or not there has been a waiver, the court is to indulge every reasonable presumption against waiver." *See id.* at 404, 97 S.Ct. at 1242. The burden is on the state to prove " 'an intentional relinquishment or abandonment of a known right or privilege.' " *Id.* (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)). Consequently, the waiver of the right to counsel under the sixth amendment requires the state to prove not only comprehension and understanding of this right by the accused, but an intentional relinquish-

ment of the right as well. *Brewer, supra*, 430 U.S. at 404, 97 S.Ct. at 1242. It seems clear that with the heavy burden on the state to overcome every reasonable presumption against waiver by clearly showing the accused understood his right to counsel and then intentionally abandoned that right, any requirements for a sixth amendment waiver of the right to counsel must be stringent. I do not believe that perfunctory *Miranda* waivers are sufficient to overcome a presumption against waiver and show a sixth amendment waiver. *See United States v. Mohabir*, 624 F.2d 1140, 1146–48 (2d Cir. 1980).

Instead, I agree with the standard for a sixth amendment waiver of the right to counsel set forth by Judge Simpson when he said:

> [T]he responsibility of a trial judge in determining whether a defendant has effectively waived his right to counsel at trial is distinguishable from that of government agents wishing to interrogate a suspect represented by an attorney. But while the specific inquiry to be made in each case varies, the underlying purpose remains the same: *Johnson v. Zerbst* [which involved a waiver of counsel at trial] "applies equally" to both situations. *Brewer v. Williams, supra*, 430 U.S. at 404, 97 S.Ct. at 1242. Quite simply, a person cannot "knowingly and intelligently" waive a right if he lacks some rudimentary understanding of how he might be affected by relinquishing that right. At a trial, with all its precedural complexities, detailed explanation by the judge may be necessary to assure that the defendant has this rudimentary understanding. Less explaining may be required in the interrogation context, but surely more is necessary than the bare statement that "you have the right to an attorney". A layman, however intelligent or well educated, should not be expected to understand *how* a lawyer can assist him in the face of criminal charges.

10. The parties only briefed whether the confessions had been obtained in violation of Boggs's sixth amendment right to counsel.

**462**

This basic principle lies at the heart of the cases construing the right to counsel.

The Sixth Amendment "embodies a realistic recognition of the obvious truth that the average defendant does not have the professional legal skill to protect himself when brought before a tribunal with power to take his life or liberty, wherein the prosecution is presented by experienced and learned counsel". *Johnson v. Zerbst, supra,* 304 U.S. at 462–63, 58 S.Ct. at 1022.

*United States v. Brown,* 569 F.2d 236, 243 (5th Cir. 1978) (Simpson, J., dissenting) (footnotes omitted). *See also United States v. Mohabir, supra.*

I do not believe an accused can understand his right to counsel and then intentionally relinquish it without knowing how counsel can be of benefit to him at that point and the consequences of waiving his right to counsel.[11] For that understanding, some explanation by the authorities is required because a layman does not possess the necessary legal acumen—that is the purpose for the constitutional guarantee of assistance of counsel.

In the instant case, it is not claimed that Boggs was made aware of and understood the benefit of counsel and the consequences of waiving that right. No evidence of that fact exists. Rather, the record discloses a systematic course of action by the police to deliberately elicit incriminating statements from Boggs, absent a valid waiver. Under these circumstances, I believe Boggs' sixth amendment right to counsel was violated and his confessions should have been suppressed. Additionally, if *Edwards v. Arizona, supra,* applies to this case, there was no valid waiver of the fifth amendment right to counsel. Therefore, I dissent.

SEILER, Judge, dissenting.

I agree with Judge Bardgett's expressed view that the criteria of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d

378 (1981) were not satisfied and that under *Edwards* there was no valid waiver of defendant's fifth amendment right to counsel. I agree further with Judge Bardgett's expressed view that defendant's sixth amendment right to counsel was violated. I therefore dissent.

---

11. "The Court's sixth amendment decisions are premised on the assumption that, at least with respect to government efforts to elicit incriminating statements, the defendant is entitled to substantially the same type of protection he would have at trial." White, Book Review, 129 U.Pa.L.Rev. 994, 1003 (1981) (footnote omitted).